**UNITED STATES of America, Plaintiff,**

**v.**

**DALLAS COUNTY COMMISSION, et al., Defendants.**

**Civ. A. No. 78–0578–H.**

United States District Court,
S.D. Alabama, S.D.

June 16, 1986.

that she is capable of any gainful activity. This standard is the core of the medical equivalence test....

Jefferson B. Sessions, III, U.S. Atty., Mobile, Ala., J. Gerald Hebert, Ellen M. Weber, Paul Hancock, Policarpio A. Marmolejos, Voting Section, Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

John E. Pilcher, Cartledge W. Blackwell, Jr., Philip Henry Pitts, William T. Faile, Selma, Ala., Edward S. Allen, Birmingham, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Chief Judge.

This cause was originally filed by the United States on October 19, 1978. In this litigation, the United States has challenged the at-large method of electing the Dallas County Commission and the Dallas County Board of Education as violative of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1971 and 1973, and the Fourteenth and Fifteenth Amendments. The Government alleges essentially that the at-large electoral system unconstitutionally dilutes or cancels the voting strength of the black population of Dallas County. The plaintiff and the defendants entered into a joint Pretrial Order which was approved by the Court and which constituted a final statement of the issues involved, governed the conduct of the trial and constituted the basis for any relief afforded by the Court. 548 F.Supp. at 796–98 and 878–80. On November 26, 1979, this action came on for trial before the Court, without a jury. Trial proceedings were held on November 26–30, 1979 as well as March 10–19, 1980. By order of this Court entered on September 3, 1982, the Court granted the Dallas County Board of Education's Rule 41 motion and determined that final judgment on the merits should be rendered in favor of the School Board de-

fendants and against the plaintiff. *United States v. Dallas County Commission*, 548 F.Supp. 794 (S.D.Ala.1982). On September 10, 1982, this Court issued an opinion and entered judgment for the Dallas County Commission defendants. *United States v. Dallas County Commission*, 548 F.Supp. 875 (S.D.Ala.1982).

Pursuant to the Government's appeal in this action, the United States Court of Appeals for the Eleventh Circuit affirmed in part, reversed in part and remanded the case directing this Court to reconsider certain of its Findings of Fact. *United States v. Dallas County Commission*, 739 F.2d 1529 (11th Cir.1984). The Court of Appeals concluded that this Court had wrongly decided two of eight principle factors necessary to the analysis of the Governments' claim under amended § 2 of the Voting Rights Act—racial polarization in voting and the structure of the election system. The Court of Appeals also concluded that with respect to a third factor—the existence of past discrimination and its limiting effects—some of this Court's subsidiary factors were correct while others were erroneous. 739 F.2d at 1535.

The Court of Appeals issued no directive requiring this Court to hold post-remand evidentiary hearings to supplement the record or requiring this Court to review other than the existing record at the time of remand. The United States and the Dallas County Commission,[1] however, desired to offer additional evidence. The Government specifically sought an evidentiary hearing "limited to post–1980 events that might tend to affect the findings of racially discriminatory results by the court of appeals." (Government's Brief in Support of Motion for Hearing at 10). The Court, based on its prior experience in *United States v. Marengo County Com-*

*mission*, 731 F.2d 1546 (11th Cir.1984), agreed to accommodate these parties and testimony was taken for the better part of a week, from February 24–28, 1986.

It was evident at the hearing that Government's counsel orchestrated its presentation of additional testimony so as to specifically address and support the Eleventh Circuit's findings and did so principally through the offices of the expert Dr. Lichtman. Accordingly, the Court now enters the following Findings of Fact and Conclusions of Law based upon the evidence produced at the hearing, the briefs and arguments of counsel and the record as a whole.

## FINDINGS OF FACT

### 1. Racial Polarization

In relation to the factor identified as "racially polarized voting", this Court had originally found evidence of polarization in the voting of both white and black voters in Dallas County, but had concluded that such polarization "did not constitute the only reason for the failure of blacks to win elections." 548 F.Supp. at 905. The Court of Appeals took issue with this conclusion, specifically finding that:

- The record does not contain evidence supporting the district court's finding that apathy was a prime cause of black defeat ...

- The record also does not support the district court's conclusion that campaigns of blacks as candidates of fringe parties and against incumbents helped to explain the polarized voting occurring in Dallas County ...

- [T]he failure of blacks to solicit white votes may be caused by the effects of past discrimination, an

---

1. By order of this Court entered on January 15, 1986, the motion of the Dallas County Board of Education, its Superintendent and members, for severance from the remand proceedings pending against the Dallas County Commission, its members and the Judge of Probate, was granted. The Court further announced its intent to proceed with an evidentiary hearing addressed

solely to the Dallas County Commission. On March 31, 1986, this Court entered an order denying the Government's motion for a preliminary injunction barring elections for members of the Dallas County Board of Education under the existing at-large election system prescribed by Alabama Code § 16–8–1 (1975).

issue that we direct be reconsidered on remand ...

739 F.2d at 1536. In support of the Eleventh Circuit's position, the Government relied principally upon the highly theoretical analysis of Dr. Allan J. Lichtman, identified by the witness as "ecological regression, the standard method for inferring the behavior of population groups from data collected for political units." (Government's Exhibit B–3 at p. 4).[2] Dr. Lichtman emphatically concludes that, based on his analysis of several black-white election contests subsequent to 1978, there existed "extreme racial bloc voting in Dallas County elections since 1978." (Government's Exhibit B–3 at p. 13).[3] Dr. Lichtman also concluded that in the face of what he found to be extreme polarization, other factors such as the tendency to vote for candidates perceived to be the "better qualified" or to vote for incumbent candidates, are irrelevant.[4] In addition, Dr. Lichtman examined the influence of "housing values" and also concluded that "race far overshadows socio-economic standing as an influence on voter choice in white vs. black contests." (Government's Exhibit B–8).

In contrast, the defendant's expert, Dr. James Voyles, testified that he addressed the issue of racial polarization primarily in light of the definition of "racially polarized voting" propounded by Dr. Timothy G. O'Rourke and adopted by the Eastern District Court of Virginia in *Collins v. City of Norfolk, Virginia* 605 F. Supp. 377 (E.D. Va. 1984) which involved the examination of three factors delineated as follows:

First, the presence or absence of "white backlash", that is, whether white voters turn out in greater numbers than usual in response to the potential election of black candidates. Second, the voting patterns of black and white voters over a period of years. Finally, whether whites attempt to limit the field of candidates.

605 F. Supp. at 386. Dr. Voyles' testimony indicated that, in relation to the first factor, he would restrict the analysis of white backlash to the appearance of a surge of white voters to defeat a black candidate in a runoff election.[5] Dr. Voyles concluded that no white backlash was evident in the 1982 primary runoff election for Associate Justice, Alabama Supreme Court or in the 1984 runoff and general election for Dallas County Tax Collector, both including black candidates, inasmuch as black voters turned out in greater numbers than white voters.

In relation to the second factor, voting patterns of black and white voters, Dr. Voyles utilized a technique identified as "correlation analysis" or "Pierson product", a method which examines the relationship between two variables: 1) the percentage of black registered voters per precinct; and 2) the percentage of votes received by the winning candidate per pre-

---

**2.** Dr. Lichtman described the ecological regression procedure he utilized as one "which incorporates data from all Dallas County precincts [and by which he] generates prediction equations that indicate how turnout and voting behavior respond to variations in the proportion of whites and blacks among the registrants of each precinct." (Government's Exhibit B–3 at p. 5). Lichtman testified that the data which was incorporated in his analysis included census reports, voter registration records and election returns. Dr. Lichtman further set forth the general form of the regression equation as "$Y = a + bx$" and fully delineated the procedure in Appendix E of Government's Exhibit B–4. The specific results of Dr. Lichtman's statistical analysis are set forth in Government's Exhibits B–3, B–4, B–5, B–8, B–9 and B–10.

**3.** Dr. Lichtman specifically found that "in every [election] contest, racial bloc voting prevails to the extent that a clear majority of black voters opted for black candidates and a clear majority of white voters opted for a white candidate." Government's Exhibit B–3 at p. 6. *See also,* Government's Exhibit B–5.

**4.** *See* Government's Exhibits 8–9 and B–10.

**5.** In addition to questioning the relevancy of "white backlash" inasmuch as "there may be a number of reasons within the white community [for increased turnout] which have nothing to do with race", Dr. Lichtman testified that the test for "white blacklash" is whether whites turn out in increased numbers in black vs. white contests than in contests without black candidates. Dr. Lichtman then concluded that white voters turn out in greater numbers in contests involving black candidates. (Government's Exhibit B–4, Appendix D).

cinct. The statistical result of this analysis is reflected in a "squared correlation coefficient" figure identified as "$R^2$". Dr. Voyles testified that to be significant, that is, to indicate a positive correlation between race and voting pattern, the $R^2$ figure must reach a level of .7.[6] According to the summary of Dr. Voyles' findings, submitted as Defendant's Exhibit 2, a positive correlation was reached in the following election contests: 1982 primary elections for County Commission, West District and City District and Board of Education, Place 5; 1982 run-off election for County Commission, City District; and 1984 primary, run-off and general election for Tax Collector.

In relation to the third factor, slating or whites attempting to limit the field of candidates, Dr. Voyles testified that inasmuch as an abundance of white candidates ran in each election, no evidence existed to indicate that a white political structure in Dallas County limited the field to a single white candidate to prevent white dilution. Dr. Voyles further opined that no evidence exists to indicate that blacks were prohibited from running for any office.

Based on his analysis of the aforementioned factors, Dr. Voyles concluded that no patterns of racial bloc voting existed with respect to the Associate Justice, Alabama Supreme Court race or with respect to those county elections without black candidates. Dr. Voyles further concluded that, with respect to those county elections with black candidates, some patterns of racial bloc voting appeared to be present but that little significance ought to be attributed to such a finding in light of the possible effect of "cross pressure" on black voter turnout, which, according to the witness, can only be measured by personal interviews with registered voters to determine why they chose not to vote.[7] Dr. Voyles defined "cross-pressure" as a case in which the voter finds himself pressured on two fronts and, therefore, opts not to vote. Dr. Voyles also concluded that racial polarization was evident in the 1984 Tax Collector's race, but that no significance should be given to this finding inasmuch as the black candidate nonetheless won the election.

The Court is aware that statistical estimates of voting behavior, and not evidence which in any way can be said to reflect the rationale behind an individual's selection of a particular candidate, were used by both the Government and the defendant. The Court is also acutely aware that such statistical estimates are subject to a variety of interpretations and can obviously be manipulated to support the desired result. Under these circumstances, the Court is charged to tread in omniscient fashion through a maze of analytical rhetoric and thereby decide the fate of every citizen, black and white, of Dallas County. In quest of a resolution of the issue involving racial polarization, the Court has carefully reconsidered the evidence presented during the original trial of this action and has evaluated the evidence now before the Court pursuant to the post-remand evidentiary hearing of February, 1986. Although the Court cannot agree that its original findings lacked support in the record, particularly in light of this Court's opportunity to view the witnesses, judge their credibility and draw rational inferences from that testimony, the Court now finds that evidence presented relative to elections held since the entry of this Court's judgment in September, 1982, will not serve to change the opinion expressed by the Court of Appeals.

2.  Structure of the Election System

As regards the structure of the election system, the Court of Appeals specifically concluded that:

---

6. On cross-examination, the Government assailed Dr. Voyles' present use of the .7 figure to indicate a positive correlation and demonstrated that on several occasions in this case (Transcript, pp. 1729, 1747–8) and in other cases, Dr. Voyles had testified that an $R^2$ figure of .5 was sufficient to indicate a significant relationship.

7. On cross-examination, Dr. Voyles admitted that he did not know for a fact that "cross-pressure" was a factor in any election in Dallas County as no house canvas was performed.

[T]he district court erred in finding that the combination of a majority requirement in the primary, the significance of the Democratic primary and the use of numbered posts did not operate to cancel voting strength of minorities.

739 F.2d at 1537. This Court shall, therefore, as directed, incorporate the Eleventh Circuit Mandate that the mentioned combination operates to cancel voting strength of minorities in Dallas county.

The third factor addressed on appeal, past discrimination and its lingering effect, relative to which certain subsidiary findings were questioned by the Court of Appeals, therefore, becomes superfluous to any final decision in this action.

## CONCLUSIONS OF LAW

1. Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

2. In order to establish a violation of Section 2, the Government in this case may present evidence relative to the "typical" factors set forth by the Senate Committee as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, antisingle shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S. Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 206–07. The Senate report also indicates two additional factors as having probative value:

1. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

2. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisites to vot-

ing, or standard, practice or procedure is tenuous.

*Id. See* also, *Zimmer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir.1973) (en banc), aff'd on other grounds sub nom. *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam).

3. This Court is charged with the duty to consider the existence, or lack of existence of these aforementioned factors in the aggregate, or as the language of Section 2 states, based on the "totality of circumstances". The Senate Committee emphasized that it did not intend that the factors be used "as a mechanical 'point counting' device." S. Rep. No. 417, 97th Cong., 2d Sess. 29 n. 118, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 207. There is no requirement, therefore, that the Government prove that all or even a majority of these factors are present. *Id. See also, Zimmer,* 485 F.2d at 1305.

 4. It is abundantly clear that, in this Circuit, great weight is attributed to the analysis of two of the factors enumerated above—polarized voting and the structure of the election system. *Dallas County, supra,* 739 F.2d at 1537. In compliance with the Eleventh Circuit's mandate, this Court has found that the combination of a majority requirement in the primary, the significance of the Democratic primary and the use of numbered posts operates to cancel voting strength of black minorities in Dallas County. This Court has also found that, based on the evidence presented during the course of the post-remand evidentiary hearing relative to elections held since the entry of this Court's original judgment, that there is no substantial change in the voting patterns in Dallas County. In view of these findings and the appellate mandate, the Court concludes that the at-large election scheme utilized in the election of members for the Dallas County Commis-

sion violated Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973.[8]

5. Because the at-large system of electing members of the Dallas County Commission has been found violative of Section 2, it is unnecessary for the Court to reach the constitutional claims presented.

It is, therefore, ORDERED, ADJUDGED and DECREED that Judgment be entered in favor of the United States and against the defendants, the Dallas County Commission, et al. By separate order entered March 6, 1986, the election for members of the Dallas County Commission under the at-large system was enjoined by this Court. Accordingly, the Court shall retain jurisdiction of this matter for purposes of issuing additional orders as may be appropriate.

---

8. The net effect of the conclusions here reached will one day rise up to haunt its advocates. This will require the further establishment of voting ghettos that in turn will serve to further isolate the races as they seek to reach an accord of citizenship. What a pity we are so shortsighted.