**UNITED STATES of America, Plaintiff,**

v.

**DALLAS COUNTY COMMISSION, et al., Defendants.**

**Civ. A. No. 78–578–H.**

United States District Court,
S.D. Alabama, S.D.

May 21, 1987.

Jefferson B. Sessions, III, U.S. Atty., Mobile, Ala., J. Gerald Hebert, Ellen M. Weber, Paul Hancock, Voting Section Civil Rights Division, Dept. of Justice, Washington, D.C., for plaintiff.

John E. Pilcher, Cartledge W. Blackwell, Jr., Philip Henry Pitts, William T. Faile, Selma, Ala., Edward S. Allen, Birmingham, Ala., for defendants.

### ORDER

HAND, Chief Judge.

This cause came on for oral arguments on April 22, 1987 relative to the objections raised by the Government in its critique of the Court's proposed districting plan of March 10, 1987. The Government objects to the Court's proposed plan on the singular ground that the inclusion of the probate judge, who is elected at-large, as a voting member of the Dallas County Commission, does not fully cure the violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, in this case.[1]

■ The Government first argues that the Dallas County Commission plan should entirely correspond to the yet to be approved or adopted plan submitted by the Dallas County School Board, which the Government anticipates will consist of five single-member districts, to avoid voter confusion and to ease the administration and conduct of elections. The Court, however, concludes that it would be inappropriate to predicate a decision regarding the legality of the County Commission plan primarily upon the anticipated design of a separate and distinct governing body's districting plan.

■ The Court must also take issue with the Government's adamant contention that the finding of a Section 2 violation as to the

---

1. The Government concedes that the four single-member districts incorporated in the Court's proposed plan "appear to offer black and white citizens an equal opportunity for effective political participation insofar as those four seats on the commission are concerned."

Dallas County Commission, in and of itself, mandates the removal of all existing at-large seats on the commission. The Court must again reject such a contention as it did by order of August 8, 1986 in *United States v. Marengo County Commission,* 643 F.Supp. 232 (S.D.Ala.1986), to-wit:

> The Court rejects plaintiff's invitation to hold that a liability ruling such as was entered in this case automatically dictates the eradication of all at-large seats for governing bodies. Such an interpretation of the exception set forth in [*Edge v. Sumter County School District,* 775 F.2d 1509 (11th Cir.1985) ] would inihilate (sic) a court's ability to examine on an ad hoc basis the totality of the circumstances presented and thereby to fashion an equitable remedy which does not intrude upon state policy any more than is necessary to meet the specific constitutional violations involved. [*Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) ], citing *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

643 F.Supp. at 235. While it is true that in *Marengo County, supra,* the Court found no rationale for maintaining the at-large chair with respect to either the Marengo County Commission or the Marengo County Board of Education, the Court was not confronted in that case, as it is here, with a situation in which the Alabama legislature has statutorily designed the probate judge of the county to chair and be a member of the county commission. Despite the Government's protestations to the contrary, this does not constitute a distinction without significance.

■ In this regard, the Government argues that, while the at-large election of the probate judge is justified because the duties of this single-person office are uniquely executive/judicial, there exists no justification for persons elected to the probate judgeship position to operate in a representative capacity. The Government also argues that such a grant of authority to operate in a representative capacity does not represent state policy inasmuch as only 33 of 67 counties in Alabama come within the auspices of statutes such as 1901 Ala. Acts 328. The Court, however, is in no position to declare, based on the evidence of record in this case, that no rational basis exists for the Alabama Legislature's decision to authorize the probate judge of certain Alabama counties, many of which are rural counties, to wear essentially two hats. Obviously, the Government seeks to have this Court question the legislature's wisdom regarding its decision to utilize one elected official in such counties in two governmental capacities, without contending that the legislature lacked authority to so legislate. This the Court cannot do. Therefore, the Court shall not attempt to second guess the legislature on this matter. The Court further notes that the Government does not contend that the laws pursuant to which the probate judge of the 33 versus 34 Alabama counties were granted representative as well as executive/judicial duties have been significantly altered since their inception, particularly as such a law has been applicable to Dallas County.

■ The Government's remaining arguments are obviously directed at the principal issue now before the Court: whether the Court's proposed plan remedies the Section 2 violation in this case in the least intrusive manner possible under the circumstances. The Government argues that the position of probate judge is beyond the reach of black voters and thus future elections to this position will not attract black candidates or encourage large black voter turnout. The Government further argues that elections to this position will not produce someone at all inclined to be responsive to black voter interests. The Government further surmises that given two black majority districts and two white majority districts, the probate judge, a person not responsive to black voter interests, will likely be casting a deciding vote more frequently than in the past, thus elevating his position to the most important and powerful member of the commission. Consequently, the Government proposes that the probate judge be removed from the commission and that, in his stead, a fifth member be selected from a fifth single-member

district designed in such a manner as to constitute a "swing" district.[2]

The Court must at the outset take serious exception to the Government's contention that elections to the position of probate judge will not produce someone at all inclined to be responsive to black voter interests. Such a characterization is clearly not supported by the evidence of record. *See, e.g., United States v. Dallas County Commission,* 739 F.2d 1529, 1540 (11th Cir. 1984) (After reviewing the entire record, the court concluded that the district court's finding that the commission is responsive to the needs of blacks is not clearly erroneous.). The record does support, however, this Court's finding, left undisturbed by the Eleventh Circuit, that:

> Probate Judge John W. Jones, Jr. was originally elected in the May 4, 1976 Democratic Primary winning without a runoff against two white and one black opponents. In that race it is evident that Judge Jones received a substantial number of black votes, even though he was then opposed by Mr. Samson Crum, a major political leader within the black community.

*United States v. Dallas County Commission,* 548 F.Supp. 875, 903 (S.D.Ala.1982). The Court also finds that the Government's evidence, presented at the post remand hearing held February 24–28, 1986, confirms that Judge Jones won reelection in 1982 by receiving 70% of the black vote and 87% of the white vote. (Government's Exhibit B–4 at p. 9). The fact that Judge Jones, the incumbent candidate, ran unopposed by a black candidate in 1982 cannot diminish the significance of the black support he obviously garnered before and maintained since his 1976 election.

The Court is aware that the evidence relative to Judge Jones' election and reelection does not render insignificant the conclusion that the at-large scheme of election for the Dallas County Commission, as a whole, is violative of Section 2 of the Vot-

ing Rights Act, 42 U.S.C. § 1973. This evidence, however, does raise a crucial question as to the appropriateness of generalizing certain findings and conclusions when faced with a unique situation involving one specific seat on a five member governing body. This is particularly true in this case, with respect to the probate judgeship position, in light of the Government's proposed remedy.

The Government here proposes the creation of a fifth single-member district designed to constitute a "swing" district. The Government refers specifically as an example to the five single-member district plan adopted by this Court in *United States v. Marengo County Commission, supra,* 643 F.Supp. at 232. The *Marengo County* plan produced:

> [T]wo districts with substantial black voter majorities of 72.5% and 69.1%; one district with a substantial white voter majority of 73.6%; one district with a slight white voter majority of 57.0%; and one district with a slight black voter majority of 56.6%.

643 F.Supp. at 233. In comparison to certain districts comprising the *Marengo County* plan, the plan now under consideration for the Dallas County Commission produces: two districts with substantial black voter majorities of 75.8% and 67.2%; one district with a substantial white voter majority of 68.8%; and one district with a slight white voter majority of 55.2%. In addition, the Dallas County Commission plan calls for the at-large election of the probate judge from a county in which the Government concedes that the black citizens comprise 54.5% of the general population and 49.8% of the voting age population.

Upon careful consideration of the Dallas County Commission plan in comparison with the *Marengo County* plan, the Court is frankly at a loss to understand the Government's rationale for substituting a

---

**2.** The Government adheres to its proposal that an additional member of the commission be selected from a fifth single-member district even if the Court should ultimately decide not to remove the probate judge as chairman, thus converting the commission membership to six. A further proposal involves a similar six member commission, but advocates that the probate judge be relieved of his voting power in part or entirely.

single-member "swing" district for what amounts to the county-wide district proposed by the Court. The Court's proposed at-large district is comprised of a general population which is 54.5% black and a voting age population which is 49.8% black. A single-member district similarly constituted would in fact be considered a swing district and would, in combination with four additional single-member districts comparable to those now proposed by the Court, constitute a fair election plan.

The Court at this juncture must note that the Government continues to contend that the winner of a swing district or any district with less than a 65% black voter majority is more likely to be a white candidate than a black candidate. The Court finds such a contention to be not only highly speculative, but to expand the meaning and intent of the Voting Rights Act beyond permissible limits. As applied to this case, however, it is apparent that if the Government's hypothesis is correct, the creation of the Government's proposed "swing" district will not alter the results presently anticipated and ascribed by the Government to the Court's plan. Rather, the Government's proposal, at best, would merely alter the individuals involved.

It is, therefore, apparent that under the unique circumstances of this case, the Court's plan is a fair election plan for the Dallas County Commission. There exists no evidence to support the Government's contention, given a 54.5% majority in the general population and a 49.8% constituency among the voting age population of Dallas County and given that black voters constitute a substantial majority in two single-member districts and that such voters will also vote for the probate judge, that the position of probate judge will not attract black candidates or encourage large black voter turnout.[3] It is also apparent that, should the Court set aside its present plan and draw a plan as proposed by the Government, the citizens of Dallas County, both black and white, would thereafter be required to assume the burden of compensating an additional elected official, a situation not at issue in *Marengo County* and clearly not necessary under the unique facts of this case.

For the reasons set forth above, it is ORDERED, ADJUDGED and DECREED that the Court's proposed plan of March 10, 1987, a copy of which is appended hereto,[4] be and is hereby ADOPTED as the plan under which future elections for the Dallas County Commission are to be conducted. Accordingly, it is ORDERED that the defendants, the Dallas County Commission: Chairman John W. Jones, Jr. and members Deans E. Barber, Jr., William H. Kendrick, C. Stanley Baldwin, James S. Wilkinson; Earl Goodwin, Chairman of the Dallas County Democratic Executive Committee; and John J. Grimes, Chairman of the Dallas County Republican Executive Committee, be and are hereby DIRECTED to conduct the elections for the members of the Dallas County Commission pursuant to the plan adopted herein and in accordance with applicable state and local law during the general election to be held in November, 1988.

The Court is of the opinion that, in light of the proximity of the 1988 general election, little benefit would be served by compelling the Dallas County citizens to incur the expense of a special election. However, in the event that a county-wide election is scheduled for another purpose prior to the 1988 general election, the Court will entertain a motion to advance elections relative to the Dallas County Commission.

---

3. It is also inconceivable to this Court that, given (1) the potential to effect the outcome of any election in District 2 of the Court's plan by virtue of a population base of 44.4% versus only 55.2%; and (2) the potential to effect the election of probate judge, black citizens in District 2 would lack motivation to participate actively in the political process.

4. Inasmuch as the parties have already been provided a copy of the Court's plan, no duplicate copies shall accompany this order.