850 F.2d 1433
 57 USLW 2063, 11 Fed.R.Serv.3d 1028,
47 Ed. Law Rep. 857
 UNITED STATES of America, Plaintiff-Appellant,
Samson Crum, Sr., Edwin Moss, Frederick D. Reese, Clarence
Williams, on behalf of themselves and all others
similarly situated, Movants-Appellants,
v.
DALLAS COUNTY COMMISSION, DALLAS COUNTY, ALABAMA, et al., Defendants,
Dallas County Board of Education, John J. Grimes, Jr.,
William R. Martin, Harold Joe Bradford, Dr. Catherine
Bozeman, Elton R. Ralston, Members, Earl Goodwin, Chairman
of the Dallas County Democratic Executive Committee, and
John J. Grimes, Chairman of the Dallas County Republican
Executive Committee, Defendants-Appellees.
 No. 87-7766.
 United States Court of Appeals,
Eleventh Circuit.
 July 13, 1988.
Rehearing and Rehearing In Banc Denied July 13, 1988.
 
 Larry T. Menefee, Birmingham, Ala., Neil Bradley, American Civil Liberties Union Foundation, Inc., Atlanta, Ga., Marie Klimesz McElderry, U.S. Dept. of Justice, Jessica Dunsay Silver, Civil Rights Div., J. Gerald Hebert, U.S. Dept. of Justice, William Bradford Reynolds, Voting Section, Gerald W. Jones, Civil Rights Div., Paul F. Hancock, Washington, D.C., J.B. Sessions, U.S. Atty., Mobile, Ala., for plaintiff-appellant.
 Cartledge W. Blackwell, Jr., Blackwell & Keith, Selma, Ala., for Dallas County Comn., et al.
 John E. Pilcher, Pilcher & Pilcher, P.C., Selma, Ala., for Dallas County Bd. of Ed., et al.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before HILL and HATCHETT, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this vote dilution suit, the United States appeals from a final judgment imposing a court-ordered election plan for the Dallas County Board of Education (School Board) (Alabama). The final judgment followed the district court's finding that the School Board's at-large electoral system impermissibly diluted black voting strength, in violation of section 2 et seq. of the Voting Rights Act of 1965, 42 U.S.C. Sec. 1973 et seq., as amended. Because we find that the district court's remedial plan is insufficient to cure the violation, we reverse.
 
 BACKGROUND
 
 2
 Dallas County is located in south-central Alabama and ranks eleventh in size of Alabama counties. Much of the county's population resides in Selma, the county's major municipality. According to the 1980 census, the county had a population of approximately 50,000 residents. Black persons comprised approximately 55-percent of the total population, 49-percent of the voting age population, and 44.8-percent of the registered voters. The most recent voter registration statistics in the record (1984) indicate that 37,232 persons were registered, of whom 18,043 were black (48.46-percent), and 19,189 (51.54-percent) were white.
 
 
 3
 The members of the Dallas County Board of Education are elected pursuant to Chapter 8 of Title XVI of the 1975 Code of Alabama and other laws of the state of Alabama generally governing elections. Under an option of Alabama Code Sec. 16-8-1, the School Board is comprised of five members who are elected at-large from numbered posts for six-year staggered terms. See Ala.Code Secs. 16-8-1 and 16-8-2.
 
 
 4
 Although the Dallas County Public School System, which encompasses all of Dallas County outside the city of Selma, has a predominantly black pupil enrollment, no black candidate has defeated a white candidate for a position on the School Board since Reconstruction. As found by the district court, black persons in the county are on average both economically and culturally less advanced than white persons, and have suffered intentional, subtle, and pervasive discrimination through legal and economic means.
 
 
 5
 The United States commenced this vote dilution suit ten years ago in October, 1978, alleging that the at-large method of electing officials to the Dallas County Commission (County Commission) and Dallas County Board of Education (School Board) impermissibly diluted black voting strength in violation of section 2 of the Voting Rights Act of 1965, 42 U.S.C. Sec. 1973, as amended, and the fourteenth and fifteenth amendments. As to the School Board, the government contended that Alabama Code Sec. 16-8-1, which provides for at-large school board elections in thirty-five Alabama counties, including Dallas, had been unconstitutionally applied.
 
 
 6
 The case was originally tried in 1979 and 1980 under the standards articulated by the former Fifth Circuit in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (in banc), aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). At the close of the government's evidence, the School Board moved for an involuntary dismissal pursuant to Fed.R.Civ.P. 41(b). This motion was still pending when the Supreme Court rendered its decision in Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).
 
 
 7
 In Bolden, a majority of the Court extended the discriminatory intent requirement for fourteenth amendment equal protection violations under Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and its progeny, to challenges under the Voting Rights Act. After receiving briefs from the parties on the impact of Bolden, the district court dismissed the School Board from the suit on July 31, 1981.[1] The court did not, however, enter final judgment on the merits until September 3, 1982. At that time, the district court entered judgment for the School Board and against the United States. United States v. Dallas County Commission, 548 F.Supp. 794 (S.D.Ala.1982).
 
 
 8
 On appeal, we affirmed in part, vacated in part, reversed in part, and remanded for further proceedings. See United States v. Dallas County Commission, 739 F.2d 1529 (11th Cir.1984). We held that the district court was clearly erroneous in finding that racial polarization in voting was not a significant factor in the consistent defeat of black candidates. Dallas County, 739 F.2d at 1536. We also held that the district court was clearly erroneous in ruling that the requirement that candidates run from numbered posts did not militate in favor of a finding of dilution. Dallas County, 739 F.2d at 1537. Consequently, we reversed and remanded for further consideration. Dallas County, 739 F.2d at 1537.
 
 
 9
 On remand, the district court granted the School Board's motion for severance from the Commission portion of the case. The government then moved for a preliminary injunction against primary elections scheduled for June, 1986 for both the Commission and the School Board. The district court denied the motion, reasoning that our 1984 decision "left undisturbed the critical [f]indings of [f]act and [c]onclusions of aw ... of th[e] [district] court's determination that judgment on the merits should be rendered in favor of the School Board."[2]
 
 
 10
 The government appealed. On appeal, we held that although we affirmed the district court's decision as to the constitutionality of section 16-8-1, our 1984 decision "did not affirm the 1982 judgment entered by the district court with respect to Sec. 2 of the Voting Rights Act as it pertains to the School Board." United States v. Dallas County Commission, 791 F.2d 831, 832 (11th Cir.1986). Accordingly, we again reversed and remanded with directions that the district court grant the government's motion for a preliminary injunction against the upcoming School Board elections. Dallas County, 791 F.2d at 833.
 
 
 11
 Shortly after our decision directing the court to enjoin the School Board elections, the district court entered judgment in favor of the United States and against the County Commission defendants, declaring the at-large method of electing members to the Commission violative of section 2 of the Voting Rights Act. United States v. Dallas County Commission, 636 F.Supp. 704 (S.D.Ala.1986).[3]
 
 
 12
 Thereafter, on September 29, 1986, the district court conducted a post-remand evidentiary hearing regarding the School Board. The government's evidence consisted primarily of a transcript of the February, 1986 post-remand hearing pertaining to the Commission and exhibits which had been admitted into evidence during that hearing. The School Board offered no new evidence, but adopted the evidence presented by the Commission during the February, 1986 hearing. Finding no evidence produced at the School Board hearing to contradict the evidence upon which it relied in determining that the Commission's at-large election scheme was infirm under section 2, the court adopted its findings and conclusions as set forth in United States v. Dallas County Commission, 636 F.Supp. 704 (S.D.Ala.1986) (finding Commission's at-large election scheme violative of section 2). Accordingly, the court concluded that the at-large electoral system utilized in the election of members to the Dallas County Board of Education likewise violated section 2 of the Voting Rights Act.
 
 
 13
 The court then directed the School Board to prepare a fair election plan and submit it to the court and to the Attorney General for preclearance under section 5 of the Voting Rights Act. Following the court's directive, the School Board submitted a new five single-member district plan to replace the at-large electoral method prescribed by Alabama Code Sec. 16-8-1 (1975).[4] Although the Attorney General precleared the School Board's proposed change from at-large elections to a five single-member district plan, he objected to the apparent concentration of blacks into one district and the fragmentation of the remaining black population between two other districts. Because he found that the circumstances suggested that the Board's efforts were "motivated, at least in significant part, by racial considerations," the Attorney General concluded that the School Board had not met its burden of demonstrating that the proposed plan would not deny or abridge black citizens' right to vote.
 
 
 14
 Consequently, the district court proposed to implement the County Commission plan as to the School Board with certain adjustments to accommodate for the exclusion of the probate judge. Following an evidentiary hearing, and over the objection of the government, the district court ordered its Commission plan into effect as to the School Board for the November, 1988 general election. United States v. Dallas County Commission, 671 F.Supp. 1337, 1339-40 (S.D.Ala.1987).
 
 
 15
 The United States appealed. On April 6, 1988, we granted the government's motion to stay the elections pending appeal for the Dallas County Commission and the Dallas County Board of Education scheduled for June 7, 1988, and also to toll the qualification period for candidates, until further order of this court.
 
 ISSUES
 
 16
 The issues on appeal are: (1) whether the district court's remedial plan for election of members to the Dallas County Board of Education complies with section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. Sec. 1973; and (2) whether the district court properly denied the motion of the applicants, Samson Crum, Sr., Edwin Moss, Frederick D. Reese, and Clarence Williams, to intervene in this action as plaintiffs pursuant to Rules 24(a) and 24(b), Federal Rules of Civil Procedure.
 
 DISCUSSION
 I.
 
 17
 Section 2 of the Voting Rights Act provides:
 
 
 18
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....
 
 
 19
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
 
 
 20
 42 U.S.C.A. Sec. 1973 (West Supp.1988). "It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2." Dillard v. Crenshaw County, 831 F.2d 246, 249 (11th Cir.1987) (citing Edge v. Sumter County School District, 775 F.2d 1509, 1510 (11th Cir.1985)). This principle coincides with legislative intent that when devising election plans to remedy section 2 violations, federal courts "should exercise ... traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 31, reprinted in 1982 U.S.Code Cong. & Adm.News 177, 208.
 
 A.
 
 21
 The district court's proposed election plan consists of four single-member districts, two of which contain black voter majorities of 75.8-percent and 67.2-percent, a third district containing a white voter majority of 68.8-percent, and a fourth district containing a white voter majority of 55.2-percent. In addition to the four single-member districts, the district court's plan also provides for at-large election of the fifth member to the School Board. In contrast to the plan adopted with respect to the County Commission, however, the at-large member of the School Board is not automatically designated chairman of the Board. Instead, designation of the chairman is left to the individual Board members:
 
 
 22
 Black White Total % Black % White
 ------ ----- ------ ------- -------
District 1 8,998 4,315 13,377 67.2 32.3
District 2 6,103 7,592 13,745 44.4 55.2
District 3 4,210 9,194 13,344 31.5 68.8
District 4 10,246 3,203 13,515 75.8 23.7
 
 
 23
 The government objects to the district court's election plan on the principal ground that the court's inclusion of an at-large member on the Board does not provide black voters with an equal opportunity to participate in the electoral process and elect candidates of their choice. The government argues that although blacks would have an opportunity to elect candidates of their choice in two of the four single-member districts, the at-large position is beyond the reach of black voters given the political environment in Dallas County which is dominated by racially-charged concerns. In addition, the government argues that the district court failed to comply with the Supreme Court's teachings in Wise v. Lipscomb, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) that "federal courts, absent special circumstances, [should] employ single-member districts when ... impos[ing] remedial [election] plans...." Wise, 437 U.S. at 540, 98 S.Ct. at 2497.
 
 
 24
 DISTRICT TOTAL POP. WHITE POP. BLACK POP. % WHITE % BLACK
-------- ---------- ---------- ---------- ------- -------
 ONE 10,796 3,871 6,512 35.8 60.3
 TWO 10,773 6,853 3,521 63.6 32.6
 THREE 10,886 7,493 3,285 68.8 30.1
 FOUR 10,904 848 9,781 7.7 89.7
 FIVE 10,622 5,140 5,442 48.3 51.2
 
 
 25
 We note that "at-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme. The Supreme Court has repeatedly said that at-large procedures are not unconstitutional per se." Dillard v. Crenshaw County, 831 F.2d 246, 250 (11th Cir.1987) (citing Rogers v. Lodge, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)). Nonetheless, we also emphasized in Dillard that "[t]his court cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation." Dillard, 831 F.2d at 252.
 
 
 26
 We agree with the government that the district court's election plan does not comply with section 2. Evidence adduced during the October, 1987 School Board hearing reveals that many of the concerns which prompted our remand of this case in 1984 continue to exist.[5] See United States v. Dallas County Commission, 739 F.2d 1529 (11th Cir.1984) (reversing the district court's findings that racially polarized voting and the structure of the Dallas County election system were not significant factors indicating a dilution of the black vote and directing that the court also reconsider on remand "past discrimination and its lingering effects").
 
 
 27
 During the October, 1987 hearing, the government offered the testimony of Dr. Allan J. Lichtman. Dr. Lichtman, who testified as an expert witness, expressed the opinion that the court's proposed election plan, particularly the at-large feature, would not provide black voters an equal opportunity to participate fully in the electoral process and elect representatives of their choice. Specifically, Dr. Lichtman testified that, contrary to the district court's conclusion, the fifth at-large seat would not be a true "swing" seat, but instead would be a seat in which black voters would be effectively foreclosed from having an equal opportunity to elect candidates of their choice.[6]
 
 
 28
 Dr. Lichtman's observations were based on two factors. First, racially polarized voting is indigenous to Dallas County. "The surest indication of race-conscious politics is a pattern of racially polarized voting." United States v. Marengo County Commission, 731 F.2d 1546, 1567 (11th Cir.), cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). In Dr. Lichtman's words:
 
 
 29
 [One] must consider the fact that [Dallas County] is a very highly polarized electorate; that the analyses that I have previously performed show that overwhelmingly blacks vote for black candidates in black versus white contests and whites overwhelmingly vote for white candidates in black versus white contests. Therefore, in the context of such polarization the ability of whites to muster [votes] at the polls means that whites through their solid voting are going to be able to elect a white candidate in [an at-large] district and it would be extremely difficult for blacks to elect a black candidate of their choice in such a district.
 
 
 30
 The second factor identified by Dr. Lichtman is that Dallas County's black citizens have a more difficult time garnering political strength than whites because of the insurmountable social and economic barriers which separate the races. In rejecting the government's proposal to substitute a single-member "swing" district for the district court's countywide at-large district, the district court reasoned that "[a] single-member district similarly constituted [54.5-percent black with a 49.8-percent black voting age population] would in fact be considered a swing district and would, in combination with four additional single-member districts comparable to those now proposed by the Court, constitute a fair election plan." Dallas County, 661 F.Supp. at 959. We disagree. Because there is a greater proportion of whites than blacks who are of voting age in Dallas County, the at-large district under the court's proposed election plan creates a district which, in fact, has a slight white voter majority in terms of the voting age population.
 
 
 31
 Although it appears negligible, this disparity is magnified when one considers the fact that black citizens share a vastly lower socio-economic status than do whites in Dallas County, and that black citizens have been the victims of past discrimination. "Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socio-economic disadvantages, which in turn can reduce participation and influence in political affairs." Marengo County, 731 F.2d at 1567; see also Zimmer v. McKeithen, 485 F.2d 1297, 1306 (5th Cir.1973) (in banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Our finding is buttressed by the testimony of Dr. Lichtman:
 
 
 32
 In my view ... even if it were part of the single-member district plan, a district with a black overall population of 54.6 percent and a black voting age population of 49.8 percent would not constitute ... a swing district for the reasons I have already explained in terms of the differences in socio-economic standing of whites and blacks which, of course, translate into differences in the ability of the two races to muster votes at the polls in the context of polarized voting we have in Dallas County. I would consider such a district, even if it were part of a plan, not to be a swing district but to be basically a district in which whites are going to have the ability to elect candidates of their choice.
 
 
 33
 The district court's proposed election plan does not comply with section 2 of the Voting Rights Act. The evidence reveals: (1) a distinct pattern of racially polarized voting; (2) a complete absence of black officials elected to the Dallas County Board of Education; (3) a history of pervasive racial discrimination that has left blacks in Dallas County economically, socially, culturally, and politically disadvantaged; and (4) an election system which has used mechanisms such as numbered posts and a majority requirement in the primary in such a manner as to cancel the voting strength of minorities. If anything, the district court's election plan, which calls for an at-large election of the fifth member to the School Board, perpetuates rather than ameliorates the inequities which have resulted in an abridgement of Dallas County's black citizens' access to the political process.
 
 
 34
 Accordingly, we hold that the proposed remedial plan drawn by the district court for election of members to the Dallas County Board of Education does not comply with section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. Sec. 1973.
 
 B.
 
 35
 Having determined that the district court's election plan does not adequately remedy the section 2 violation, the question remains as to the relief which Dallas County's citizens are now entitled. The government argues that a single-member district plan containing a fifth "swing" district would provide an adequate remedy for the section 2 violation. During the October, 1987 School Board hearing, the government admitted into evidence two voting plans consisting of five single-member districts for the district court's review. These plans were rejected.
 
 
 36
 One of these plans was drafted by Dr. Lichtman. As mentioned previously, Dr. Lichtman testified that even a single-member district with a black population which mirrored the countywide demographics (54.5-percent total black population and a voting age population which is 49.8-percent black) would constitute a secure white seat rather than a true "swing" district. Dr. Lichtman testified that due to the (1) slight white majority in the voting age population; (2) "vastly higher socio-economic standing" of whites which leads to increased participation in and influence on political affairs; and (3) extreme patterns of racially polarized voting, a single-member district would have to contain a total black population of approximately 61-percent in order to constitute a true "swing" district. Dr. Lichtman's plan which creates "two solid white, two solid black and one swing district," consists of five single-member districts, two of which contain black voter majorities of 72.4-percent and 70-percent; two white voter majority districts of 65-percent and 64-percent; and finally a fifth swing district containing a black voter majority of 61.3-percent:
 
 
 37
 (Total (Black
 
 
 38
 ------ ------
 
 
 39
 Pop.) Pop.) (% Black)
------ ------ ---------
10,455 7,571 72.4%
10,481 7,334 70.0%
11,101 6,800 61.3%
11,480 4,013 35.0%
10,464 3,770 36.0%
 
 
 40
 The district court rejected Dr. Lichtman's election plan on two grounds, both of which we find clearly erroneous. First, the court reasoned that Dr. Lichtman's swing district was not significantly different from the at-large seat which was contained in the court's proposed plan:
 
 
 41
 The Court is at odds to understand, however, what true distinction lies between a swing district of 61.3% black majority carved geographically out of a county, and a single-member countywide district of 59.4% black majority, beyond a possible change in the identity of the candidate occasioned merely by the candidate's particular residence. Surely, a 1.9% difference between these two forms of a black majority swing district cannot constitute a statistically significant difference.
 
 
 42
 Dallas County, 671 F.Supp. at 1339. The district court's finding that there is no "statistically significant difference" between the swing seat in Dr. Lichtman's plan and the proposed at-large seat in the court's plan is based upon a mathematical error. The court erroneously found that the total black population in Dallas County is 59.4-percent and that the difference between the total black population and the 61.3-percent black voter majority in Dr. Lichtman's plan is only 1.9-percent. The total black population of Dallas County, however, is 54.5-percent black, and not 59.4-percent. Thus, the difference between 54.5-percent and 61.3-percent is 6.8-percent, not the 1.9-percent difference found by the court.
 
 
 43
 The court also took issue with Dr. Lichtman's plan based on its finding "that at least two members of the five-member School Board would be elected by, and therefore represent the interests of, only citizens residing in the City of Selma, a city which has its own independent school system." Dallas County, 671 F.Supp. at 1337 (footnote omitted). No evidence in the record supports the district court's finding that candidates elected from single-member districts with a substantial majority of Selma residents would not fairly represent the interests of residents of other parts of Dallas County. In any event, the district court's plan contains two single-member districts which are substantially dominated by city residents. Given the fact that city voters comprise nearly half of Dallas County's population, it is virtually impossible to devise an election plan which complies with the one-person-one-vote requirement in which city residents would dominate in only one district. Finally, the district court's finding that "[a] third district in Dr. Lichtman's plan also appears to contain a predominant number of city residents" is also clearly erroneous. Review of Lichtman's plan shows that city residents comprise a majority in only two of the five proposed single-member districts.
 
 C.
 
 44
 Two years ago, on May 23, 1986, this court summarily ordered the enjoining of the June, 1986 School Board elections. United States v. Dallas County Commission, 791 F.2d 831, 833 (11th Cir.1986). More recently, on April 6, 1988, we granted the government's motion for a stay pending appeal of the elections for the County Commission and School Board scheduled for June 7, 1988. In that same order, we tolled the qualification period for candidates until further order of this court.
 
 
 45
 Although we would ordinarily remand this case with directions that the district court implement an election plan which fully complies with section 2, we are mindful that we "should exercise [our] traditional equitable powers to fashion ... relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 26, reprinted in 1982 U.S.Code Cong. & Adm.News 177, 208 (emphasis added). In fashioning this relief, we do not take lightly the fact that the School Board has had ample opportunity to devise an election plan which cures the section 2 violation.
 
 
 46
 Additionally, we are unaware of any reason to again remand for further proceedings. The five single-member district plan devised by Dr. Lichtman vindicates the rights of Dallas County's black citizens whose opportunity to effectively participate in the election process has been denied. Because of this lawsuit, all the citizens of Dallas County have been denied the right to govern their affairs. How long may a court of the United States allow the rights of citizens to be trampled through preclearance defaults and litigation plans? It is time for an election in Dallas County!
 
 
 47
 Accordingly, the district court's remedial plan for election of members to the Dallas County Board of Education is VACATED. The case is remanded to the district court with direction that it order the Dallas County Board of Education to conduct elections for the members of the School Board pursuant to the Lichtman plan hereby adopted by this court, and in accordance with applicable state and local law during a primary election to be hereafter scheduled and the general election to be held in November, 1988. The order of this court granting the government's motion for a stay pending appeal of the elections for the Dallas County Board of Education scheduled for June 7, 1988, and also tolling the qualification period for candidates, is hereby VACATED.
 
 II. Intervention
 
 48
 Following this court's remand in United States v. Dallas County Commission, 739 F.2d 1529 (11th Cir.1984), black residents of Dallas County moved for leave to intervene on behalf of themselves and a class of black citizens of Dallas County in order to participate on the question of remedy, pursuant to Rules 24(a) and 24(b), Federal Rules of Civil Procedure. The district court denied the motion on the ground that two of the named representatives of the plaintiff class were named representatives in a previous class action encompassing the same complaint, which had been dismissed with prejudice at the request of the named representatives in October 1977. Because no member of the class appeared to contest the dismissal, the district court reasoned that the named representatives and others had no standing to appear in the present suit.
 
 
 49
 In denying the applicants' motion for intervention, the district court did not specify whether it was treating the motion as a motion to intervene as of right under rule 24(a) or as a motion for permissive intervention under rule 24(b). The denial of a rule 24(a) motion is a final appealable order. Brotherhood of R.R. Trainmen v. Baltimore and Ohio R.R., 331 U.S. 519, 524, 67 S.Ct. 1387, 1389, 91 L.Ed. 1646 (1947); Sellers v. United States, 709 F.2d 1469, 1471 (11th Cir.1983). The time for appeal therefore began to run when the district court denied the applicants' motion on February 5, 1986, and expired sixty days thereafter. Sellers, 709 F.2d at 1471; see also Fed.R.App.P. 4.[7] The applicants' notice of appeal was not filed, however, until December 18, 1987, approximately twenty months after the denial of their motion became appealable. Accordingly, the appeal must be dismissed for lack of jurisdiction.
 
 
 50
 Because we have no jurisdiction to review the district court's denial of the applicants' rule 24(a) motion, the sole remaining question is whether the district court properly denied the motion to intervene under rule 24(b). The decision whether to allow permissive intervention is committed to the sound discretion of the district court, and will not be disturbed absent a clear abuse of discretion. Sellers, 709 F.2d at 1471; Cisneros v. Corpus Christi Independent School District, 560 F.2d 190, 191 (5th Cir.1977), cert. denied sub nom. Barnett v. Cisneros, 434 U.S. 1075, 98 S.Ct. 1265, 55 L.Ed.2d 781 (1978).[8] The applicants sought intervention approximately eight years after the commencement of this action and have offered no reason for their excessive delay. Moreover, the applicants have not demonstrated that the government cannot adequately represent their interests during the remedy phase of this litigation. Accordingly, we hold that the district court did not abuse its discretion in denying the motion for permissive intervention.
 
 CONCLUSION
 
 51
 (1) The remedial plan drawn by the district court for election of members to the Dallas County Board of Education does not comply with section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. Sec. 1973. Accordingly, the district court's order adopting an election plan, is VACATED. The case is remanded to the district court for the sole purpose of directing the members of the Dallas County Board of Education to conduct elections for the members of the School Board pursuant to the Lichtman plan adopted by this court and in accordance with applicable state and local law during a primary election to be hereafter scheduled and the general election to be held in November, 1988. The order of this court granting the government's motion for a stay pending appeal of the elections for the Dallas County Board of Education scheduled for June 7, 1988, and also tolling the qualification period for candidates, is hereby VACATED. The district court shall comply with the mandate of this court in an expeditious manner.
 
 
 52
 (2) The applicants' appeal from the district court's denial of their motion to intervene is AFFIRMED.
 
 
 53
 AFFIRMED in part, REVERSED and VACATED in part, and REMANDED with instructions.
 
 HILL, Circuit Judge, concurring specially:
 
 54
 In our system of the administration of justice it is necessary that this court and its judges be bound by the judgments of the Supreme Court. It is also very important that there be adherence to the doctrine of stare decisis so that this panel is bound by the opinions of earlier panels of our court. For these reasons, although I find Judge Gibson's dissent persuasive, I feel compelled to concur in the judgment.
 
 
 55
 I have previously expressed my view that the approach we are taking to the right of each of us to vote is, in these cases, ill-advised. See Kirksey v. Board of Sup'rs of Hinds Cty., Miss., 554 F.2d 139, 159 (5th Cir.1977) (Hill, J., dissenting). See also Edge v. Sumter County School Dist., 775 F.2d 1509, 1514 (11th Cir.1985) (Hill, J., specially concurring); Lee County Branch of NAACP v. City of Opelika, 748 F.2d 1473, 1483 (11th Cir.1984) (Hill, J., specially concurring). At the risk of redundancy, I write separately because I perceive it to be important that we state simply and straightforwardly just what it is that we are doing.
 
 
 56
 Simply put, we are "rigging" elections. The cases are said to be brought by or on behalf of voters, but our judicial political science is aimed at giving relief, not to voters, but to candidates. In the various political subdivisions of the states in our circuit we have gone about setting aside certain seats for black candidates to win and certain seats for white candidates to win. A prerequisite to our grant of relief is that it be found, as a matter of fact, that in these political subdivisions white voters vote as a bloc for white candidates and black voters vote as a bloc[1] for black candidates. By gerrymandering the political area so as to produce a quota of white majority districts and a quota of black majority districts, we undertake to insure, in these regrettably bloc voting places, that there will be a certain number of white officials and a certain number of black officials.
 
 
 57
 Now, it is said that this is a method of insuring that each voter has equal access to the political process, "equal access" apparently being interpreted as equal opportunity to elect the candidate of his or her choice. However, we overshoot that goal when we leave an impotent black minority in the white majority districts, and an impotent white minority in the black majority districts. Those minorities, upon the premise from which we have been judicially legislating, have utterly no access to the political process.
 
 
 58
 We are bent upon polarizing political subdivisions by race. The arrangement we construct makes it unnecessary, and probably unwise, for an elected official from a white majority district to be responsive at all to the wishes of black citizens; similarly, it is politically unwise for a black official from a black majority district to be responsive at all to white citizens. When the Voting Rights Act was passed, in those parts of the country where black citizens had been effectively disenfranchised, a fear arose among some segregationist white people that black citizens would begin to vote and, as a consequence, elected officials who hoped to be reelected might have to begin to respond to the wishes of black citizens. Such compelled responsiveness was viewed as a threat. The work of the federal judiciary in this area has removed that "threat." Under our arrangement, white citizens can elect their own candidates who do not need to give consideration to the wishes of blacks. The black voters are gerrymandered into their own districts where they can vote for their own candidates. Had this arrangement been devised by white segregationists it could not have been a more effective segregationist response to the inevitable enforcement of the Voting Rights Act.
 
 
 59
 As I stated, we resolve these cases, brought by or on behalf of voters, by creating racially "safe boroughs" for candidates. What we do serves those who would be candidates very well, but it disserves the voters, who lose the opportunity to have a political impact upon and obtain political responsiveness from all candidates and elected officeholders.
 
 
 60
 This impact and its resulting responsiveness has been demonstrated. The message of the Voting Rights Act did not create that responsiveness, but its firm and unyielding enforcement did. Governors are elected statewide, as are senators. Over the years of our republic, each of these officeholders has, by and large, represented his or her constituency. When each had a constituency that did not include blacks, there was little, if any, response to the needs and wishes of blacks. The enforcement of the Voting Rights Act worked a remarkable change in constituencies and it has been said that those who are elected to office or who hope to be reelected have "learned to count." That is the way representative government works. It is politically unsafe for an officeholder to ignore the legitimate needs and wishes of any people who have the opportunity to vote for the officeholder. If, however, by oppression or by gerrymandering, a certain group can be prevented from voting for a particular office, then the holder of that office will have no political reason to pay attention to the needs of that group. We go about cleverly accomplishing that result.
 
 
 61
 At the risk of hypocrisy we do our "rigging" disguised as geography. We segregate the races politically, by drawing district lines which divide the geography of the county based upon the race of those residing there. Race determines the geography, not the other way around.
 
 
 62
 It is not good that we engage in pretense. It is even worse when this system perpetuates racial separation. We have a Fair Housing Law, 42 U.S.C. Secs. 3601-3631; yet by creating these separate, but presumably equal, political units, we say to the voters of the county: "if you wish to participate in the political process, reside with your race in your district." Indeed, it might constitute a violation of the court decree to construct a residential project, subdivision, apartment complex, or the like which appears to be attractive to the members of one race but which is located in the district reserved for the other race. I should rather that we not discourage people from living wherever they please regardless of race.
 
 
 63
 Finally, I record here my total disagreement with the implication of Dr. Lichtman, a witness produced by the plaintiff and whose theory was accepted by the court, that in Dallas County, Alabama, or anywhere else it requires 61.03 percent black citizens to equal 38.07 percent white.
 
 
 64
 Justice Douglas expressed prophetic concern in his dissent in Wright v. Rockefeller, 376 U.S. 52, 59, 84 S.Ct. 603, 606, 11 L.Ed.2d 512 (1964). In that opinion he noted that several countries in fact segregate voting and elected positions, allocating seats to racial, ethnic and religious groups, but he voiced his belief that such separation was inappropriate in our country. Justice Douglas cited Lebanon, among others, as an example of a country which had adopted proportionate representation by religion. Id. 84 S.Ct. at 610 & n. 11. That unhappy land does not bear witness to the aspiration that these sorts of political allocations will produce harmony among a people.
 
 
 65
 I envision a paper prepared, some years from now, by a social scientist. It will report on political processes in the three states of our circuit. Assuming that we have dealt with arrangements for electing city council members, school board members and county commissioners along the lines of our precedent, the paper will accurately report that blacks are effectively excluded from voting in the majority of elections to such offices. I anticipate the paper's title being something like: "The Political Resegregation of the South." I write today so that the author may note, if he or she will, that not all of us agreed.
 
 
 66
 With regret, I concur.
 
 GIBSON, Circuit Judge, dissenting:
 
 67
 I have considerable doubts about whether the district court's remedial plan violates the Voting Rights Act. The district court's plan creates two "safe" white districts, two "safe" black districts, and a so-called swing district which is 54.5 percent black and has a 49.8 percent black voting age population. Although a more evenly divided county may be difficult to find, I would be willing to concede that in view of prior Eleventh Circuit decisions, the at-large nature of the swing district may impede the ability of black voters to compete with white voters in electing the candidate of their choice. See, e.g., Dillard v. Crenshaw County, 831 F.2d 246, 250 (11th Cir.1987).
 
 
 68
 Yet, assuming the district court erred, I am unable to concur in the majority opinion because of its reliance on the opinion of Dr. Lichtman. It was the district court's prerogative to pass on the credibility of the witnesses and here apparently the district court failed to view credibly Dr. Lichtman's testimony. I would give deference to the district court's decision in this regard rather than as an appellate court rely on the record in reviewing this credibility decision. Further, I can not endorse a plan which, in the name of equal opportunity, creates a swing district which is 61.3 percent black and 38.7 percent white. I fail to see the fairness in gerrymandering until blacks have a 22.6 percent superiority, when the majority at pages 1439-40 rejects the district court's plan on the grounds that it creates a district with a .4 percent superiority in white voting age population. I do not understand how a .4 percent white voting age superiority violates the Act while a 22.6 percent overall black superiority is mandated by the Act.
 
 
 69
 As the majority notes in footnote six, "we must ensure that this or any other plan guarantees equal access to the political process, not equal participation among races." (Emphasis in original). The majority attempts to accomplish this by gerrymandering the district lines to give greater weight to the black vote. In contemplation of a low black voter turnout in its proposed swing district, the majority has "stacked the deck" in favor of those blacks who choose to participate. The majority's plan ensures that low black participation, whatever the cause, will not reduce a black candidates ability to win. As such, it appears violative of the Equal Protection Clause and the constitutional principle of one person one vote announced in Reynolds v. Sims, 377 U.S. 533, 563, 84 S.Ct. 1362, 1382, 12 L.Ed.2d 506 (1964) wherein the Court held that "[w]eighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination.' " (Citations omitted). Although the Reynolds case dealt with disparity in population of voting districts the same principle would appear to be applicable to giving added weight to a person's vote because of racial considerations.
 
 
 70
 Furthermore, the Voting Rights Act Amendments of 1982 on its face appears aimed in subsection (a) at removing barriers to participants in the voting process by members of any race and not to give greater weight to a person's vote because of race; while subsection (b) of that Act sets forth a Congressional mandate for a violation when "the political processes ... are not equally open to participation by members of a class of citizens protected by subsection (a)...." Here the political voting process does appear to be open to all citizens regardless of race. The complaint of the government appears to be based on not the lack of openness and accessibility in the voting process but on the lack of interest or inclination to vote by certain qualified voters.
 
 
 71
 Finally, I agree with the concerns expressed by Judge Hill in his concurring opinion regarding the creation of voting districts along racial lines. "Safe" districts promote racially polarized voting and ensure that the minority voters, whether white or black, are effectively unrepresented. Certainly this is not the aim of the Voting Rights Act.
 
 
 72
 For these reasons I respectfully dissent from part I of the majority opinion, and in deference to the majority view would remand with instructions to create five separate single-member districts composed in a compact manner and approximately equal in population. I concur in part II.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Trial continued against the County Commission. After the evidence was concluded but before the case was decided, yet another intervening change in the law occurred. In response to the Supreme Court's decision in Mobile, Congress amended section 2 of the Voting Rights Act "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2." S.Rep. No. 417, 97th Cong., 2d Sess. 2, reprinted in 1982 U.S.Code Cong. & Adm.News 177, 179. After section 2 was amended, the Commission did not request that additional evidence be taken. Judgment was ultimately rendered in favor of the Commission on September 10, 1982. United States v. Dallas County Commission, 548 F.Supp. 875 (S.D.Ala.1982)
 
 
 [2]
 In a separate order entered on March 6, 1986, the district court granted the government's motion for a preliminary injunction barring elections for members of the County Commission pending final resolution of the lawsuit
 
 
 [3]
 In accordance with the district court's order, the county submitted a proposed election plan both to the court and the Attorney General, the latter submission being for the purpose of preclearance under section 5 of the Voting Rights Act, 42 U.S.C. Sec. 1973c. The plan provided for the election of four commissioners from single-member districts and for the at-large election of the probate judge, who would continue to serve as ex-officio chairman of the Commission, as provided by Alabama law. The racial composition and population of the four single-member districts of the county's proposed plan is set forth below:
 DISTRICT TOTAL POP. WHITE BLACK
 1 13,377 35.7% 63.2%
 2 13,745 55.2% 44.4%
 3 13,344 68.8% 31.5%
 4 13,515 20.2% 78.8%
 On June 2, 1986, the Attorney General objected to the county's plan and denied preclearance. The gravamen of the Attorney General's objection was that the county's plan, which fragmented an area of the black community between two districts, was enacted with the intent to deny or abridge black citizens' right to vote.
 Consequently, on March 10, 1987, the district court undertook the task of drawing its own election plan for the County Commission. Similar to the county's plan, the court's plan contains two white electoral majority districts and two black electoral majority districts. In addition, the court's plan retains the probate judge, who would be elected at-large, as a voting member of the County Commission. Over the objection of the United States and without holding an evidentiary hearing, the district court ordered the plan to take effect as of the November, 1988 general election. United States v. Dallas County Commission, 661 F.Supp. 955, 959 (S.D.Ala.1987). As will be discussed infra, the court subsequently adopted the same election plan as to the Dallas County Board of Education. See United States v. Dallas County Commission, 671 F.Supp. 1337 (S.D.Ala.1987).
 
 
 [4]
 The racial composition of the five single member districts and the population of each district of the School Board's proposed plan is set forth below:
 
 
 [5]
 The district court held an evidentiary hearing on October 2, 1987, for the purpose of entertaining the parties' objections to its proposal to implement as to the School Board the same election plan which it had previously implemented as to the County Commission. See United States v. Dallas County Commission, 661 F.Supp. 955 (S.D.Ala.1987)
 
 
 [6]
 Dr. Lichtman characterized a swing seat as one that would be "up for grabs between candidates that were the choice of the white community and candidates that were the choice of the black community" or a district within which "white voters and black voters have a relatively equal chance of electing candidates of their choice."
 Throughout oral argument in this case as well as the briefs submitted by the parties, the fifth at-large seat under the district court's plan has taken on added significance because of the realistic probability that the court's plan would produce, in the parties' words, two "black seats" and two "white seats." This is not surprising given the composition of the district court's plan, which consists of two single-member districts containing black voter majorities of 75.8-percent and 67.2-percent, and two single-member districts containing white voter majorities of 68.8-percent and 55.2-percent. Although we understand the parties' shorthand method of referring to the district court's plan as guaranteeing two "white seats" and two "black seats," in reviewing the district court's plan, we must ensure that this or any other plan guarantees equal access to the political process, not equal participation among races.
 
 
 [7]
 Rule 4, Fed.R.App.P. provides, in pertinent part:
 Rule 4. Appeal as of Right--When Taken
 (a) Appeals in Civil Cases.
 (1) In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from; but if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days after such entry. [Emphasis added.]
 
 
 [8]
 The applicants for intervention have also filed a notice of appeal from the district court's order adopting its proposed election plan as to the Dallas County Board of Education. United States v. Dallas County Commission, 671 F.Supp. 1337 (S.D.Ala.1987). The School Board, citing Brotherhood of R.R. Trainmen, argues that the applicants have no standing to challenge the district court's judgment on the merits because they were never parties to the proceedings below. We need not pass upon this question in light of our holding that the district court did not abuse its discretion in denying the applicants' motion for intervention
 
 
 [1]
 These bloc voters are sometimes referred to as a "politically cohesive" group. See Thornburg v. Gingles, 478 U.S. 30, 51, 106 S.Ct. 2752, 2767, 92 L.Ed.2d 25 (1986)