Dean Butch WILSON, et al., Plaintiffs,

v.

John W. JONES, Jr., et al., Defendants.

No. Civ.A. 96–1052–BH–M.

United States District Court,
S.D. Alabama,
Northern Division.

March 29, 1999.

Algert S. Agricola, Jr., Algert S. Agricola, Jr., (See above), Montgomery, AL, Albert L. Jordan, Wallace, Jordan, Ratliff & Brandt, Birmingham, AL, for Dean Butch Wilson, plaintiff.

Algert S. Agricola, Jr., Algert S. Agricola, Jr., Albert L. Jordan, (See above), for Johnny Middlebrooks, plaintiff.

Cartledge W. Blackwell, Jr., Selma, AL, John W. Kelly, III, Selma, AL, for John W. Jones, Jr., in his official capacity as Probate Judge of Dallas County, Alabama, defendant.

William H. Pryor, Jr., Deputy Attorney General, Office of Attorney General, Montgomery, AL, John R. Park, Jr., Office of the Attorney General, Criminal Appeals Division, Montgomery, AL, Stanley E. Graham, Waller, Lansden, Dortch & Davis, PLLC, Nashville, TN, for W.A. Kynard, in his official capacity as Circuit Court Clerk of Dallas County, Alabama, defendant.

Bruce Boynton, Selma, AL, for Erskine Minor, in his official capacity as a Dallas County Commissioner, defendant.

William H. Pryor, Jr., Bruce Boynton, Stanley E. Graham, (See above), for Perry Varner, in his official capacity as a Dallas County Commissioner, defendant.

Bruce Boynton, (See above), for Roy Moore, in his official capacity as a Dallas County Commissioner, defendant.

William H. Pryor, Jr., Stanley E. Graham, (See above), for Barbara Sweat, in her official capacity as a member of the Dallas County Board of Registrars, defendant.

William H. Pryor, Jr., Stanley E. Graham, (See above), for Thomas Craig, in his official capacity as a member of the Dallas County Board of Registrars, defendant.

Patricia Nicole Beyer, U.S. Attorneys Office, Mobile, AL, Deanne E.B. Ross, Barry Weinberg, Elizabeth nmi Johnson, Voting Section, Civil Rights Div., Department of Justice, Washington, DC, for USA, defendant.

## MEMORANDUM OPINION AND ORDER

HAND, Senior District Judge.

This voting rights litigation came on for trial before the Court on May 11–14, 1998. As of September 1, 1998, following completion of the trial transcript and the time allotted by the Court, the parties had sub-

mitted their respective post-trial briefs (Docs. 123, 128, and 132) and the Court took the matter under submission.[1] The Court has also taken under submission plaintiffs' supplemental evidence, plaintiffs' motion (Doc. 134) to file same being hereby GRANTED, together with the United States' response to same (Doc. 135).

Plaintiffs filed this action on October 25, 1996, seeking an end to the 1998 injunction which, under the guise of Section 2 of the Voting Rights Act of 1965, prohibited the probate judge of Dallas County from serving as chairman ex officio of the Dallas County Commission and yet simultaneously required the election of five commissioners from single member districts to serve as the Dallas County Commission.[2] The United States and the County Commission defendants argue not only that the plaintiffs lack standing, even as citizens and registered voters of Dallas County, to challenge the election scheme imposed by the courts, but that "the Eleventh Circuit did not change the 'size' of the Dallas County Commission" and thus did not exceed its authority to remedy violations of the Voting Rights Act as recognized inter alia in such cases as Holder v. Hall, 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994).[3] The defendants also argue, as appears often to be the inclination of our present times, that even if the Eleventh Circuit

exceeded its authority as now clearly defined by the Supreme Court in Holder, such intrusion into the legislative domain of state and county government should be ignored because plaintiffs have failed to justify the retroactive application of this principle of law. In other words, the United States and the County Commission defendants once again espouse the principle that "the end justifies the means." This Court is thus called upon to once more grapple with the nebulous authority of the federal judiciary to dictate not only the manner in which a County governing body is elected but also the form of that governing body.

For the reasons stated below, the Court concludes that the continuation of an election scheme for the Dallas County Commission which was crafted and imposed by the judiciary to remedy a vote dilution violation of Section 2 of the Voting Rights Act but which impermissibly altered the size of that governing body by expelling the chairman ex-officio simply because he was also the Probate Judge who must be elected at-large and by creating a previously unauthorized commissioner position is both illegal and unjustified under the applicable law as well as the circumstances of this case. Plaintiffs are therefore entitled to the relief they seek, namely the

1. In view of the trial conducted in this matter, the parties' respective motions for summary judgment (Docs.54, 73, 81, 92, 98) and related motions such as the motions to realign the parties (Docs. 69 and 117), the Government's motion (Doc. 71) to take judicial notice of the Eleventh Circuit Court of appeals' findings in United States v. Dallas County Commission, 739 F.2d 1529 (11th Cir.1984) and United States v. Dallas County Commission, 850 F.2d 1430 and 1433 (11th Cir.1988), plaintiffs' motion to strike the affidavit of Perry Varner (Doc. 97), and the Government's motion to exclude the testimony of plaintiffs' experts (Doc. 118) are now **DENIED** as **MOOT**. The parties' motions to file reply or amended briefs or briefs exceeding the page limit under the local rules and motions to extend the time for filing briefs (Docs. 91, 110, 119, 130 and 131) are hereby **GRANTED**.

2. The Eleventh Circuit Court of Appeals has, with respect to the Dallas County Commission, itself acknowledged:

> The Dallas County Commission was created by Act No. 328 of the Alabama Legislature of 1900–1901. The Act provided for four commissioners to be elected at-large from residency districts and for the county probate judge, also elected at-large, to serve as ex-officio chairman of the Commission. The probate judge's sole duty as ex-officio chairman is to preside over the Commission's meetings and to cast a vote in the event of a tie. The probate judge is elected to a six-year term, while the other four members of the Commission are elected to concurrent, four-year terms.

United States v. Dallas County Comm'n, 850 F.2d 1430, 1432 (11th Cir.1988).

3. See e.g., United States' Proposed Findings and Conclusions at ¶ 208.

termination of the 1988 injunction and an order directing that a new districting plan be established pursuant to which four members are to be elected from single-member districts and the Probate Judge shall resume his position as chairman *ex-officio* with the sole duty to preside over the Commission's meetings and cast a vote in the event of a tie as established by Act No. 328 of the Alabama Legislature of 1900–1901.

## I. STANDING

The United States contends that the plaintiffs "lack standing in the absence of their assertion of a claim that the current method of electing county commissioners is illegal or otherwise violates plaintiffs' legally protected rights." United States' Proposed Findings and Conclusions at p. 101, ¶ 2. Plaintiffs' standing, however, is established on both counts.

■ The illegality of the present method of electing the Dallas County commissioners cannot seriously be questioned in light of such decisions as *Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (rejecting the contention that the size of a government body, including a County Commission, may be subject to a § 2 vote dilution challenge); *Nipper v. Smith,* 39 F.3d 1494, 1532 (11th Cir.1994) (en banc) (holding that "federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies"), *cert. denied,* 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); and *White v. Alabama,* 74 F.3d 1058, 1073 (11th Cir.1996) (quoting *Nipper's* pronouncement concerning the federal courts' lack of authority to alter the size of elected bodies). The present districting plan, imposed by the Eleventh Circuit in 1988 and only revised since that time to correct population malapportionments based on 1990 census data, requires the election of five members of the Dallas County Commission from single member districts. The contention that this five single-member districting plan did not in-

crease or alter the size of the Dallas County Commission is specious. The Alabama legislature expressly dictated that the Dallas County Commission be composed of four members with the Probate Judge acting as chairman *ex officio.* It is thus beyond comprehension that the United States and the County Commission defendants could maintain the position that the present method of electing the Dallas County commissioners is not an expansion of the prior system of government and thus illegal under *Holder* and its progeny.

■ It is also specious to contend that plaintiffs have no standing to challenge the 1988 injunction which altered the democratically established system of government for the Dallas County Commission and thus affected their voting rights. *See e.g., Clark v. Putnam County,* 168 F.3d 458 (11th Cir.1999) (Recognized the standing of voters in a suit challenging the constitutionality of their county commission districts); *Meek v. Metropolitan Dade County,* 985 F.2d 1471, 1480 (11th Cir. 1993) (Recognized the private right of individuals "to vindicate important personal interests in maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered [in that] they alleged a tangible actual or prospective injury and did not merely challenge unlawful conduct in the abstract."). The Court agrees that plaintiffs' interest is sufficient to question whether a particular court order, the implementation of which clearly affects their voting rights, exceeds the authority conferred by the Voting Rights Act. As stated above, the Eleventh Circuit itself recognized in *White* not only that "federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies" but that even a consent decree "that provides a remedy agreed to by some, but not all, of the parties cannot affect the rights of a dissenting party." 74 F.3d at 1073. Plaintiffs' voting rights simply may not be

usurped by the judiciary, or the United States government, even under the guise of remedying a § 2 vote dilution violation. *Cf. also, Dillard v. City of Greensboro,* 74 F.3d 230, 235 (11th Cir.1996) (recognizing that, "[w]hen a federal court reviews a redistricting plan, it intrudes 'on the most vital of local functions'.").

■ Although the United States admits that the plaintiffs "were not parties to *United States v. Dallas County Commission,*" it nonetheless also contends that plaintiffs can only protect their voting rights by seeking to intervene in that case and only then attempt to collaterally attack the 1988 injunction. United States' Proposed Findings and Conclusions at p. 101, ¶ 1. The purpose of this supposition is presumably an attempt to subject plaintiffs to a catch–22 argument that, should they succeed in so intervening, they would then be bound by the law of the case doctrine which would prohibit the setting aside of the Eleventh Circuit's districting plan unless "a prior judgment upon which it [was] based has been reversed or otherwise vacated, or if it is no longer equitable." *Id.* at p. 102, ¶ 3. The United States relies principally on *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). However, in *Arizona,* the Supreme Court emphasized that "law of the case is an amorphous concept [which] directs a court's discretion [but] does not limit the tribunal's power." *Id.* The real property rights, namely the amount of irrigable acreage upon which the calculation of waters rights was predicated, which were at issue in *Arizona* and of particular importance to the Supreme Court are not equivalent to the voting rights which are at issue in the case at bar. The certainty of rights with respect to both land and water rights unquestionably supports the premise that "an issue once determined by a competent court is conclusive." *Id.,*

460 U.S. at 619–20, 103 S.Ct. at 1391–92. Such real property rights are in their very nature discernable and finite. The exercise of personal rights such as voting, particularly as affected by the judicial imposition of an election scheme which alters the democratically established system of government under which the plaintiffs were previously governed, cannot support a similar premise. Such personal rights are too susceptible to a myriad of interpretations and outside influences. The limitations recognized since 1988 on a federal court's authority to alter the size of an elected body, even when perceived necessary to remedy a § 2 violation, make such a distinction abundantly clear. *See e.g., Holder,* 512 U.S. at 874, 114 S.Ct. 2581; *White,* 74 F.3d at 1073; and *Nipper,* 39 F.3d at 1532.

■ Plaintiffs also have standing to the extent they claim that the Court's enforcement, and the defendants' implementation and continued maintenance, of the Eleventh Circuit's judgment imposing the present election scheme violate their rights under the Tenth Amendment. The substantive claims asserted by the plaintiffs are available to private persons. *See e.g., Seniors Civil Liberties Ass'n v. Kemp,* 965 F.2d 1030, 1034 n. 6 (11th Cir.1992); *Atlanta Gas Light Co. v. Department of Energy,* 666 F.2d 1359, 1368 n. 16 (11th Cir. 1982) (acknowledging the history of private party standing to assert claims under the Tenth Amendment). The separation of powers protected by the Tenth Amendment is intended for the protection of individual liberty, not simply sovereign prerogative. *See, New York v. United States,* 505 U.S. 144, 181, 112 S.Ct. 2408, 2431, 120 L.Ed.2d 120 (1992) (refusing to allow state officials to waive Tenth Amendment protections).

## II. VALIDITY OF THE 1988 INJUNCTION (a/k/a the Lichtman Plan).

A recitation of either the history of the litigation culminating in the 1988 injunc-

tion or the political history of Dallas County itself would serve little purpose. Such facts, opinions and analyses have been set forth on numerous occasions since 1982. *See, United States v. Dallas County Commission,* 548 F.Supp. 875, 877–914 (S.D.Ala.1982), *aff'd in part, rev'd in part, vacated and remanded,* 739 F.2d 1529, 1535–41 (11th Cir.1984); *United States v. Dallas County Commission,* 636 F.Supp. 704, 705–709 (S.D.Ala.1986); *United States v. Dallas County Commission,* 850 F.2d 1430, 1432 (11th Cir.1988) and 850 F.2d 1433, 1434–42 (11th Cir.1988). *See also, Clark v. Marengo County,* 469 F.Supp. 1150, 1172–1173 (S.D.Ala.1979); *Rollins v. Dallas County Commission,* Civil Action No. 92–0242–CB–C, 1992 WL 611861 (S.D.Ala.1992); and *United States v. Jones,* 125 F.3d 1418, 1420–23 (11th Cir. 1997).

For purposes of the current litigation, it is sufficient to set forth the following summary of pertinent facts:

1. The at-large method of electing the members of the Dallas County Commission was first challenged by the United States on vote dilution grounds in 1978.[4]

2. The case was originally tried in 1979 and 1980 under the then-prevailing standards of the Fifth Circuit as set forth in *Nevett v. Sides,* 571 F.2d 209 (5th Cir. 1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980); *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.) (en banc), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977); and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd* on other grounds *sub nom East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Later, before the case was decided, the Supreme Court decided *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a case that "completely changed the mode of as-

sessing the legality of electoral schemes alleged to discriminate against a class of citizens." *Jones v. City of Lubbock,* 640 F.2d 777, 777 (5th Cir.1981) (Unit A) (Goldberg, J., concurring), *modified,* 682 F.2d 504 (1982). After the evidence was concluded but before the case was decided, Congress amended § 2 of the Voting Rights Act to overrule *Bolden.* The parties did not request that additional evidence be taken but, instead, submitted proposed findings of fact and conclusions of law directed to the standard of the new § 2. This court subsequently found and concluded that the government had not proven vote dilution against either the Board of Education or the County Commission. *United States v. Dallas County Commission,* 548 F.Supp. 875 (S.D.Ala. 1982). The government appealed.

3. The Eleventh Circuit affirmed in part, reversed in part and remanded the case directing this Court to reconsider certain of its Findings of Fact. *United States v. Dallas County Commission,* 739 F.2d 1529 (11th Cir.1984). The Eleventh Circuit concluded that this Court had wrongly decided two of eight principal factors necessary to the analysis of the Governments' claim under amended § 2, namely racial polarization in voting and the structure of the election system. The Eleventh Circuit also concluded that, with respect to a third factor, the existence of past discrimination and its limiting effects, some of this Court's subsidiary factors were correct while others were erroneous. 739 F.2d at 1535.

4. As requested by the United States and the Dallas County Commission, the Court held postremand evidentiary hearings from February 24–28, 1986, "limited to post–1980 events that might tend to affect the findings of racially discriminatory results by the court of appeals." *United States v. Dallas County Commission,*

---

**4.** The at-large method of election of the membership of the governing body of Dallas County, Alabama was previously challenged in Court on a one-man, one-vote theory and the

method was upheld. *See, Dallas County, Alabama v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975).

636 F.Supp. 704, 706 (S.D.Ala.1986). This Court then concluded:

> It is abundantly clear that, in this Circuit, great weight is attributed to the analysis of two of the factors enumerated above—polarized voting and the structure of the election system. *Dallas County, supra,* 739 F.2d at 1537. In compliance with the Eleventh Circuit's mandate, this Court has found that the combination of a majority requirement in the primary, the significance of the Democratic primary and the use of numbered posts operates to cancel voting strength of black minorities in Dallas County. This Court has also found that, based on the evidence presented during the course of the post-remand evidentiary hearing relative to elections held since the entry of this Court's original judgment, that there is no substantial change in the voting patterns in Dallas County. In view of these findings and the appellate mandate, the Court concludes that the at-large election scheme utilized in the election of members for the Dallas County Commission violated Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973.

*Id.,* 636 F.Supp. at 710.

5. On March 10, 1987, the Court proposed its districting plan for election of the Dallas County Commission which consisted of four members elected from single-member districts and retained the Probate Judge who is elected at-large as chairman *ex officio. United States v. Dallas County Commission,* 661 F.Supp. 955, 958 (S.D.Ala.1987). The Court's plan included: two districts with substantial black voter majorities of 75.8% and 67.2%; one district with a substantial white voter majority of 68.8%; and one district with a slight white voter majority of 55.2%. *Id.,* 661 F.Supp.

at 958. The Court concluded that the at-large election of the probate judge was from a county in which the black citizens comprise 54.5% of the general population and 49.8% of the voting age population and that "[a] single-member district similarly constituted would in fact be considered a swing district and would, in combination with [the] four additional single-member districts ... proposed by the Court, constitute a fair election plan." *Id.,* 661 F.Supp. at 959.

6. Although the Eleventh Circuit agreed that "federal courts should defer to state legislative policy and modify the state's [election] plan only to the extent necessary to cure statutory or constitutional defects," it vacated this Court's proposed plan on the grounds that "inclusion of the probate judge as a voting member of the Commission, to be elected at-large, does not fully cure the section 2 violation we previously declared." *United States v. Dallas County Commission,* 850 F.2d 1430, 1432 (11th Cir.1988) (emphasis added). The Eleventh Circuit remanded the case "for the sole purpose of directing the members of the Dallas County Commission to conduct elections for the members of the County Commission pursuant to the Lichtman Plan adopted by [the Eleventh Circuit] in [*United States v. Dallas County Commission,* 850 F.2d 1433 (11th Cir.1988) (companion case involving the Dallas County Board of Education) ]." *Id.,* 850 F.2d at 1432. The Lichtman's plan consisted of "two solid white, two solid black and one swing district ... two of which contain black voter majorities of 72.4–percent and 70–percent; two white voter majority districts of 65–percent and 64– percent; and finally a fifth swing district containing a black voter majority of 61.3–percent." *Id.,* 850 F.2d at 1440.[5]

---

**5.** It is at least of interest to note one comment made by the Eleventh Circuit in connection with its analysis of the Court's proposed plan: The district court's finding that there is no "statistically significant difference" between the swing seat in Dr. Lichtman's plan and the proposed at-large seat in the court's

plan is based upon a mathematical error. The court erroneously found that the total black population in Dallas County is 59.4–percent and that the difference between the total black population and the 61.3–percent black voter majority in Dr. Lichtman's plan is only 1.9–percent. The total black popula-

7. On remand, this Court did as it was told. On or about July 13, 1988, the Court directed that election for the Dallas County Commission be conducted pursuant to the Eleventh Circuit's Lichtman Plan. It is this injunction, since modified only to rectify population malapportionments among the five judicially imposed single member districts, which became evident after the 1990 census, that is now challenged as constitutionally and statutorily unauthorized.

8. In 1980, blacks were 44.8 percent of the registered voters of Dallas County. At the time of the elections in 1988, the single member districts under the Lichtman Plan contained the following percentage of the black voting age population: District 1—72.4%; District 2—70.0%; District 3—61.3%; District 4—35.0%; and District 5—36%.

9. In 1992, the members of the Dallas County Commission redrew the lines for the single member districts in light of the 1990 census which resulted in the following distribution of the blacks voting age population: District 1—77.1%; District 2—61.0%; District 3—72.9%; District 4—28.1%; and District 5—30.4%. This redistricting was submitted to the United States Department of Justice on March 26, 1992, and precleared by letter dated May 12, 1992. Although the United States and the County Commission defendants infer that the 1992 districting plan was an independent plan based solely on "traditional race-neutral districting principles" (County Commission's Proposed Findings and Conclusions at p. 114, ¶ 5; United States' Proposed Findings and Conclusions at p. 92, ¶ 197), defendants' own admissions belie the assertion of either autonomy or race-neutral focus. The County Commission defendants have proposed the following findings and conclusions which demonstrate that the 1992 districting plan is irreparably intertwined with the Eleventh

Circuit's Lichtman Plan and the 1988 injunction imposing same:

(a) "[Commissioner] Minor wanted to follow the Lichtman Plan as nearly as possible at the time the new district lines were drawn. R257 and 275"

(County Commission's Proposed Findings and Conclusions at p. 23, ¶ 80).

(b) "In adopting the 1992 redistricting plan the commission followed the same guidelines that were used in 1988 when the Lichtman Plan was implemented. R257"

(*Id.* at p. 24, ¶ 81).

(c) "The 1992 redistricting plan was based upon the 1990 census. R275"

(*Id.* at p. 24, ¶ 86).

(d) "The original court ordered plan was based upon the 1980 census. R275"

(*Id.* at p. 24, ¶ 87).

(e) "Plaintiffs' exhibit four which represent the racial demographic data under the 1990 census for the current five district plan for the election of Dallas County Commissioners reflect that the plan provides fair opportunity for black and white voters to elect candidates of their choice. If one will look here at the so-called swing district, it is something over sixty-five percent total black, based on ninety census and it is identical in terms of the 1990 census data to the plan that was put in operation in 1998 ... R607–608"

(*Id.* at 89, ¶ 358 (emphasis added) quoting Alan Lichtman's testimony).

(f) "In drafting the 1992 plan the commission did not want to place blacks in a worse position than they were under the 1988 plan based on the 1990 census. R 753"

(*Id.* at p. 104, ¶ 441).

tion of Dallas County, however, is 54.5–percent black, and not 59.4–percent. Thus, the difference between 54.5–percent and 61.3–percent is 6.8–percent, not the 1.9–percent difference found by the court.
850   F.2d at 1441.

(g) "At the reapportionment office the 1988 map was put up and the computer printed out various demographics such as where people had moved ... R757"

(*Id.* at p. 105, ¶ 446, summarizing Perry Varner's testimony).

(h) "The ninety-two plan minimally changed the 1988 plan because from 1988 to 1992 the overall shift in population was not that great and the ninety-two plan makes allowances for those shifts but it was not as though each line had to be redrawn. R759"

(*Id.* at p. 105, ¶ 447, summarizing Perry Varner's testimony).

(i) "The 1992 plan that created district 2 ... was to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." [Citation omitted].

(*Id.* at p. 112–13, ¶ 1).

Similarly, the United States has proposed the following findings and conclusions which demonstrate that in 1992, the Commission merely amended the 1988 Lichtman Plan to accommodate the 1990 census data:

(a) "Members of the county commission reasonably believed that the non-retrogression requirement of [§ ] 5 meant that the [1992] districting plan ... could not diminish or reduce the opportunity for black persons in Dallas County to elect candidates of choice from that provided by the 1988 court-ordered districting plan, using 1990 Census data. Accordingly, in order to meet the [§ ] 5 non-retrogression requirement, the black voting age population in District 2 needed to be at least 61[%], absent mitigating circumstances that justified departure from that benchmark. 1998 TR. at 751–54, 793, Testimony of Commissioner Perry Varner."

(United States' Proposed Findings and Conclusions at p. 74, ¶ 155).

(b) "The Eleventh Circuit ... ordered the Dallas County Commission to adopt a five single-member district method of election and to implement the five district plan [Lichtman Plan] proposed by the United States for the election of county commissioners ("1988 court-ordered plan"), stating that the two 'strong' majority white districts, the two 'strong' majority black districts, and a fifth 'swing' district in which 'white voters and black voters have a relatively equal chance of electing candidates of their choice' would provide all voters with equal access to the political process."

(*Id.*, at p. 83, ¶ 176).

(c) "The 1992 redistricting plan ... only made minimal changes to the 1988 court-ordered plan ..."

(*Id.*, at p. 92, ¶ 197).

(d) "The districts in the 1992 redistricting plan ... are similarly configured as the districts in the 1988 court-ordered plan ..."

(*Id.*, at p. 93, ¶ 198).

(e) "Members of the county commission reasonably believed that the non-retrogression requirement of [§ ] 5 meant that the [1992] districting plan ... could not diminish or reduce the opportunity for black persons in Dallas County to elect candidates of choice from that provided by the 1988 court-ordered districting plan, using 1990 Census data. Accordingly, in order to meet the [§ ] 5 non-retrogression requirement, the black voting age population in District 2 needed to be at least 61[%], absent mitigating circumstances that justified departure from that benchmark. 1998 TR. at 751–55 ..."

(*Id.*, at p. 94–5, ¶ 202).

(f) "In 1992, the benchmark Dallas County Commission plan was the 1988 court-ordered plan using the 1990 Census data." ·

(*Id.*, at p. 126, ¶ 59).

(g) "Compliance with the non-retrogression requirement of [§ ] 5 provided Dallas County in 1992 with compelling governmental interest that sufficiently justified maintaining three black districts each with black voting strength equal to the majority black districts in the [1988] court-ordered plan under the 1990 Census data."

(*Id.*, at p. 127, ¶ 60).[6]

(h) "The Dallas County Commission was substantially justified ... in maintaining approximately the same racial percentages in the 1992 redistricting plan as had the districts in the 1988 court-ordered plan under the 1990 Census...."

(*Id.*, at p. 128, ¶ 63).

In view of the admissions of these defendants, it would be inappropriate for this Court to grant such deference to the 1992 amendments to the Eleventh Circuit's 1988 Lichtman Plan as might be otherwise accorded a districting plan independently created by an untainted legislative body.

10. The 1990 census figures revealed that the total black population in Dallas County had increased to 57.8 % and that the percentage of black registered voters had increased to 52.8% of the total voting age population in Dallas County.[7] As of October 1996, the percentage of black registered voters had increased to 55.25% of the total voting age population in Dallas County. (Plaintiff's Exhibit 42.)

The Court has, by addendum, extrapolated some of the numerous agreed facts incorporated by the parties into the Pretrial Order which governed this case. The facts enumerated in the addendum are relevant only to the extent they provide: (1) an historical perspective of the Eleventh Circuit's conclusion that the at-large election of the four Dallas County Commissioners from residency districts under Act No. 328 violated § 2 and that such violation must be remedied by requiring such Commissioners to be elected from single-member districts; and (2) support for the proposition that the circumstances on which this remedy with respect to the aforementioned four Commissioners was predicated have not changed sufficiently since 1988 to justify a withdrawal of that remedy. Plaintiffs do not challenge or seek elimination of the requirement that the four Commissioners authorized by Act No. 328 be elected from single-member districts. Plaintiffs challenge only the removal of the Probate Judge and the requirement that an additional fifth Commissioner be elected from a single-member district. The Court has omitted from its extrapolation, those matters designated as agreed facts by the parties which are either irrelevant to the present litigation or contain opinions not properly classified as findings of fact, whether or not agreed to by the parties.

As stated previously, the United States and the County Commission defendants argue first that the limitation imposed by

---

6. It is self-evident that the United States Department of Justice, the fox in charge of the hen house, would never have pre-cleared any plan offered by the Dallas County Commission in 1992 which did not mirror the 1988 court-ordered Lichtman Plan proposed in the first instance by that government entity.

7. According to the parties' agreed facts and the 1990 census, the total black population of Dallas County is now 57.9% and, as intended by the drafters of the 1992 revised districting plan, District 2 became the "swing" district in the 1992 elections and contained a 61.0% black voting age population. Thus the statistical significance between the 57.9% total black population and the 61.0% black voter majority in the new swing district of the Lichtman Plan has now diminished to a mere 3.1%, less than one-half of the 6.8% found not to be sufficiently insignificant by the Eleventh Circuit in 1988. *Cf., United States v. Dallas County Commission*, 850 F.2d 1430, 1431 (11th Cir.1988), with Agreed Facts 20, 24, 25, 31 and 102.

*Holder* and its progeny is inapplicable because "[t]he Eleventh Circuit did not change the 'size' of the Dallas County Commission; but rather changed the method by which those commissioners were elected." United States' Proposed Findings and Conclusions at p. 97, ¶ 208 and p. 105, ¶ 11. According to the defendants, the Dallas County Commission was comprised of five members both prior and subsequent to imposition of the challenged 1988 injunction. Even the Eleventh Circuit recognized, however, that prior to 1988, Alabama law "provided for four commissioners ... and for the county probate judge ... to serve as ex-officio chairman." 850 F.2d at 1431–32. The defendants thus attempt to compare apples with oranges in an effort to avoid the limitations which are now recognized as legitimate proscriptions against judicial overreaching.[8]

The United States also argues that *Holder* "prohibits Section 2 *challenges* to the size of an elected body; it does not prohibit imposition of an appropriate *remedy* for a judicially determined violation of Section 2." United States' Proposed Findings and Conclusions at p. 104, ¶ 8 (emphasis in original). It is, however, axiomatic that if size cannot constitute a violation of § 2, it cannot serve as a remedy for some other violation of that act. It is also evident that, since size cannot constitute a violation of § 2, this Courts proposed 1987 election plan retaining the Probate Judge as chairman and requiring the election of four commissioners from single member districts did not constitute a violation of § 2 and thus could not then and cannot now be considered an inadequate remedy. *See e.g., Nipper,* 39 F.3d at 1533 ("The absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability.").

■ As the Supreme Court emphasized in *Holder,* "[i]n order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it should be for minority voters to elect their preferred candidates under an acceptable system." but that "[t]here is no principled reason why one size [of a government body] should be picked over another as a benchmark." 512 U.S. at 880, 114 S.Ct. at 2586–87. Consequently, the federal courts have no authority to usurp state legislative function by imposing its own benchmark regarding the size of a government body when there exists no reason to choose one size over another. The Eleventh Circuit itself has recognized as much in *Nipper v. Smith,* when it held that "federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies." 39 F.3d at 1532. Contrary to the United States' attempt to distinguish *Nipper* and the later case of *SCLC v. Sessions,* 56 F.3d 1281, 1297 (11th Cir.1995), on the grounds that "consideration of a state's interest in maintaining a challenged judicial electoral system should be given deference not accorded to the state's interest in maintaining a legislative electoral system" (United States' Proposed Findings and Conclusions at p. 104, ¶ 7), the Eleventh Circuit made no such distinction nor should it have. Such a contention ignores every principle of separation of powers on which our democratic form of government is founded and presumably maintained.

The United States, in another obvious effort to skirt the issue, contends that the Eleventh Circuit "made the appropriate comparison between the then-existing five

---

**8.** *See also,* Plaintiffs' Proposed Findings and Conclusions at pp. 24–25, ¶¶ 65–70, delineating the difference between the Probate Judge who served as Chairman *ex officio,* voted only in the case of a tie and is a full-time official elected every six years with the new official elected under the Eleventh Circuit's Lichtman Plan who has unlimited voting power, is a part-time official and is elected every four years. It is also evident that the newly created official receives compensation not previously authorized from County revenues.

member county commission elected at large and the five single-member district method of electing county commissioners in evaluating plaintiff's Section 2 claim [and] [t]hus, the Supreme Court's concern ... of a lack of 'acceptable principles' guiding a court's determination of 'reasonable alternative benchmarks' ... did not arise [in the case then at bar]." United States' Proposed Findings and Conclusions at p. 106, ¶ 13. Such a contention is not only a fanciful interpretation of past events but puts the cart before the horse.[9] The Supreme Court has recognized that the size of a governmental entity cannot constitute a violation of § 2 because "there is no principled reason why one size should be picked over another." 512 U.S. at 880, 114 S.Ct. at 2586–87. A federal court may not, therefore, alter the size of a government body even in the guise of remedying some other violation of § 2. Consequently, any comparison the Eleventh Circuit might have made between the former 4 and 1 system of electing the Dallas County Commission and its own Lichtman Plan, a comparison which was not made within the meaning of *Holder*, would not change the result that the imposition of the Lichtman Plan was and remains beyond the court's constitutional and statutory authority.

### III.  Retroactive Application of *Holder v. Hall*

■ The United States, and the County defendants by adoption, argue that retroactive application of *Holder v. Hall* is inappropriate because "Plaintiffs have asserted no adequate equitable or legal basis to apply [this decision] retroactively." United States' Proposed Findings and Conclu-

sions at p. 107, § 15. This argument is also specious.

The decision of this Court regarding the continuation of a judicially imposed injunction that altered the election system under which the Dallas County Commission is elected is based on the present illegality of that injunction and election scheme. The Court is not, therefore, retroactively applying *Holder*. The fact that, under *Holder*, the Eleventh Circuit was never authorized to impose the Lichtman Plan does not convert this case into a retroactive application of law necessitating an evaluation under the factors set forth in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (an action in which the Supreme Court refused to retroactively apply a decision regarding the applicable statute of limitations because it was a decision which overruled a long line of decisions by the Fifth Circuit, was unforeseeable and would have barred plaintiff's personal injury lawsuit).

The cases relied upon by the defendants in support of their contention that there exists no equitable or legal basis to apply *Holder* retroactively actually illustrate the absurdity of viewing the case at bar as one involving a question of retroactivity. In *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), the Supreme Court declared unconstitutional a state statute allowing only "property taxpayers" to vote in elections to approve the issuance of revenue bonds by a municipal utility because "the impact of the revenue bond issue on [property owners] is unconnected to their status as property taxpayers." 395 U.S. at 705, 89 S.Ct. at 1900.

---

9.  It should also be noted that in *Holder* itself the United States as *amicus curiae* argued three reasons why the Eleventh Circuit's comparison of the Bleckley County's sole commissioner system with a hypothetical five-member commission was appropriate: "(1) because the five-member commission is a common form of governing authority in the State; (2) because the state legislature had authorized Bleckley County to adopt a five-member commission if it chose (it did not); and (3) because the county had moved from a

single superintendent of education to a school board with five members elected from single member districts." *Holder*, 512 U.S. at 880, 114 S.Ct. at 2587. The Supreme Court rejected these reasons and the attempted comparison concluding that "[t]hese referents do not bear on dilution." *Id.* The Supreme Court also emphasized that "it is one thing to say that a benchmark can be found, quite another to give a convincing reason for finding it in the first place." *Id.*

The *Cipriano* decision was given only prospective application to bond issues where "the time for challenging the election result has not expired, or in cases brought within the time specified by state law for challenging the election and which are not yet final." 395 U.S. at 706, 89 S.Ct. at 1901. The Supreme Court concluded that "[s]ignificant hardships would be imposed on cities, bondholders, and others connected with municipal utilities if our decision today were given full retroactive effect ... [i.e.] where the authorization to issue the securities is legally complete on the date of this decision." 395 U.S. at 706, 89 S.Ct. at 1900–01. *Cipriano* did not involve an issue concerning the continued viability of an injunction imposing a judicially crafted election system. *Cipriano* merely involved a decision concerning the constitutionality of a State statute, the retroactive application of which might have caused horrendous economic ramifications.

As the United States itself recognized, *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), involved a determination that certain State election laws and regulations were subject to the § 5 preclearance requirements of the Voting Rights Act. The *Allen* court declined to set aside the elections conducted pursuant to these laws because "[t]hese § 5 coverage questions involve complex issues of first impression—issues subject to rational disagreement [and][t]he state enactments were not so clearly subject to § 5 that the appellees' failure to submit them for approval constituted deliberate defiance of the Act ... [and] the discriminatory purpose or effect of these statutes, if any, has not been determined by any court." 393 U.S. at 572, 89 S.Ct. at 835. The *Allen* court then instructed the district courts "to issue injunctions re-

straining the further enforcement of the enactments until such time as the States adequately demonstrate compliance with § 5." *Id.* Unlike the case at bar, therefore, the *Allen* court was asked to set aside elections conducted pursuant to State election laws which were "not so clearly subject to § 5" as to impute deliberate defiance on those charged with violating the Voting Rights Act.[10] *Allen* did not involve an issue concerning the continued viability of an injunction imposing a judicially crafted election system. In point of fact, the case at bar might actually be said to be similar to *Allen* inasmuch as this Court is essentially merely restraining the further enforcement of the 1988 injunction requiring elections under the Lichtman Plan as adjusted in 1992 to comport with 1990

In *Bailey v. Ryan Stevedoring Co.*, 894 F.2d 157 (5th Cir.1990), *cert. denied*, 498 U.S. 829, 111 S.Ct. 89, 112 L.Ed.2d 61 (1990), the Fifth Circuit addressed an effort by the plaintiff to reopen his case to assert a claim for attorney's fees two years after the Supreme Court denied *certiorari* based on a change in law that would allow a partially successful plaintiff to recover such fees if he succeeded on a significant, if not central, issue. The *Bailey* court merely concluded that "Rule 60(b) does not give the right to reopen litigation finally concluded over two years previously on the grounds of a change in the law." 894 F.2d at 160. *Bailey* presented no issue concerning the continued viability of an injunction imposing a judicially crafted election system now determined to be illegal.

The cases relied upon by the defendants simply do not prohibit the plaintiffs from challenging and the Court from determin-

---

**10.** The Supreme Court in *Holder* also held that a distinction exists between § 2 and § 5 of the Voting Rights Act. The Court specifically stated: "we do not think that the fact that a change in a voting practice must be precleared under § 5 necessarily means that the voting practice is subject to challenge in a dilution suit under § 2 ... [because] the two

sections differ in structure, purpose, and application." 512 U.S. at 883, 114 S.Ct. at 2587. Although "retrogression" in the position of racial minorities with respect to their effective exercise of their voting rights is the principle inquiry under § 5, it "is not the inquiry in § 2 dilution cases." 512 U.S. at 883–84, 114 S.Ct. at 2587.

ing, in light of the Supreme Court's present interpretation of the law, the continued viability of an injunction mandating that elections for the Dallas County Commission must be conducted under an election scheme which was beyond the authority of the federal courts to impose. The Court is thus applying *Holder* prospectively, not retroactively.

## IV. CHANGED CIRCUMSTANCES?

The defendants also contend that the Court may not depart from the Eleventh Circuit's election scheme, the Lichtman Plan, unless the circumstances have changed sufficiently to warrant such departure. United States' Proposed Findings and Conclusion at pp. 111–112, ¶¶ 20–24. The circumstances referred to are the continued political cohesiveness and geographic compactness of the black population of Dallas County as well as racial bloc voting allegedly still used by white citizens to defeat the preferred candidates of the black citizens.[11] The United States also contends that "[a] probate judge is not a judge in the traditional sense or for the purpose of analysis of voting behavior." *Id.* at p. 11, ¶ 20.[12] The defendants have again missed the essential point. The issue before this Court is not the existence, continued or otherwise, of a § 2 violation as it pertains generally to the at-large election of the Dallas County Commission but, rather, the continued viability of an injunction which imposed a judicial remedy now recognized to be beyond the authority of the federal court which mandated it. It is the status of the law relating to the limitations on a federal court's power to impose certain remedies, such as those requiring the alteration in the size of a governing body as a remedy for a § 2 violation, and not changed factual circumstances that govern the issue at hand.

Apparently, no other court has been faced with such an issue. Perhaps no other federal court, in contravention of its constitutional or statutory authority as now clearly recognized in *Holder*, has imposed an election scheme which required the removal of an official elected to a government body pursuant to state law and in his place required the election of another official from an additional single member district of the court's own creation. The court's power to set the offending injunction aside cannot seriously be questioned.

Justice Cardozo once observed that "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 461, 76 L.Ed. 999 (1932). He further noted:

> The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative. [Citation omitted]. The result is all one whether the decree has been entered after litigation or by consent. [Citation omitted]. In either event, a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through

**11.** Although the United States disputes the relevance of the evidence, it does not dispute that in the June 2, 1988 primary election, the June 30, 1998 primary run-off election and the November 3, 1998 general election black candidates running against white candidates won county-wide elections, including the re-election pf Franklyn Bailey as Dallas County Coroner, the re-election of Nathaniel Walker as Dallas County District Judge, and the election of Marvin Wayne Wiggins as Circuit Judge for the 4th Judicial Circuit of Alabama, part of which is comprised by Dallas County. *Cf.* Plaintiffs' Motion to Supplement the Record (Doc. 134) and United States' Response (Doc. 135).

**12.** In view of the prior and more recent success of black candidates running against white candidates for county-wide judicial positions, it is understandable that the United States would seek to minimize the relevance of that success.

changing circumstances into an instrument of wrong.

286 U.S. at 115–15, 52 S.Ct. at 461. The voting rights at issue in the case at bar, particularly as affected by the 1988 injunction, are not impervious to change. The myriad of cases emanating from all levels of the federal judiciary since 1988 which have addressed issues relating to both § 2 and § 5 of the Voting Rights Act make that all too clear.[13] Thus, this Court cannot abdicate its responsibility to monitor, amend or even vacate that which has become, under *Holder*, an instrument of wrong with respect to the election of the Dallas County Commission.

In a case involving the propriety of modifying "an institutional reform consent decree," the Eleventh Circuit held that "a district court abuses its discretion if it refuses to make modifications required by applicable law." *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1563 (11th Cir.1994), *citing, Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 573–83, 104 S.Ct. 2576, 2585–90, 81 L.Ed.2d 483 (1984); and *Rufo v. Inmates*

*of Suffolk County Jail*, 502 U.S. 367, 388, 112 S.Ct. 748, 762, 116 L.Ed.2d 867 (1992) ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law."). The *Ensley* court also summarized:

> The Supreme Court has articulated a two-pronged approach to determining when, and to what extent, an institutional-reform consent decree that "arguably relates to the vindication of a constitutional right" should be modified. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, [383] n. 7, 112 S.Ct. 748, 760 n. 7, 116 L.Ed.2d 867 (1992). The first prong requires the party seeking modification to "establish that a significant change in facts or law warrants revision of the decree." *Id.* [502 U.S. at 384], 112 S.Ct. at 765. If the moving party satisfies this requirement, then the second prong requires the court to make modifications that are "suitably tailored" to address the new factual or legal environment.

---

13. *See e.g., Abrams v. Johnson*, 521 U.S. 74, 117 S.Ct. 1925, 1933–36, 138 L.Ed.2d 285 (1997) (district court did not err in refusing to conform its plan to Georgia's 1991 uncleared plan by including at least two majority black districts because the 1991 uncleared plan was the result of impermissible race-focused "Justice Department pressure" and "to create a second majority-black district in Georgia would allow, *inter alia*, race to predominate."); *Bush v. Al Vera*, 517 U.S. 952, 116 S.Ct. 1941, 1950–51, 135 L.Ed.2d 248 (1996) (applied strict scrutiny to redistricting efforts challenged on grounds of racial gerrymandering); *Holder v. Hall*, 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (rejecting contention that the size of a government body may be subject to a § 2 vote dilution challenge); *Shaw v. Reno*, 509 U.S. 630, 633, 113 S.Ct. 2816, 2819, 125 L.Ed.2d 511 (1993) (addressed "two of the most complex and sensitive issues ...:" the meaning of the constitutional "right" to vote, and the propriety of race-based state legislation designed to benefit members of historically disadvantaged racial minority groups" and held that an equal protection claim existed when "redistricting legislation ... is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification."); *White v. Alabama*, 74 F.3d 1058, 1066 and 1071 (11th Cir.1996) ("determination of the size of the state's appellate courts is the legislative prerogative [and] the Attorney General lacked the authority to remover the selection of an appellate judge from the ballot box"; "an appointment procedure such as the one the district court would implement in this case is a remedy foreclosed by the Voting Rights Act."); *S.C.L.C. v. Sessions*, 56 F.3d 1281, (11th Cir.1995) ("Subdistricting [judicial elections] would strip every voter residing beyond a judge's subdistrict of his or her participation in the judicial selection process—leaving the judge accountable only to those voters in his or her subdistrict."); *Nipper v. Smith*, 39 F.3d 1494, 1533 (11th Cir.1994) ("the existence of a workable remedy within the confines of the state's system of government is critical to the success of a vote dilution claim [and][t]he absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability.").

31 F.3d at 1563. With specific respect to modifications required in light of changing legal standards, the Eleventh Circuit recognized that "[a]bove all, '[a] consent decree must ... be modified if ... one or more of the obligations placed upon the parties has become impermissible under federal law.'" 31 F.3d at 1563, *citing, Rufo*, 502 U.S. at 388, 112 S.Ct. at 762.[14] The standard imposed for a consent decree cannot be any greater or less than the standard imposed with regard to a court-imposed injunction.

It is therefore imperative that, in view of *Holder* and its progeny, the 1988 injunction requiring elections for the Dallas County Commission under the Eleventh Circuit Lichtman Plan be vacated. The removal of the Probate Judge as chairman *ex officio* of the Dallas County Commission and his replacement by a fifth commissioner constituted nothing more or less than judicial overreaching and is impermissible under the law.[15]

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that the 1988 injunction, as amended by the Dallas County Commission in 1992, which imposed and maintained the Lichtman Plan, an election scheme for the Dallas County Commission which removed the Probate Judge as chairman *ex-officio* and created a previously unauthorized commissioner position, is due to be and is hereby **VACATED.** Accordingly, it is **FURTHER ORDERED** that judgment be entered in favor of the plaintiffs, Dean Butch Wilson and Johnny Middlebrooks, and against the defendants, John W. Jones, Jr., Probate Judge of Dallas County; Harris Huffman, Sheriff of Dallas County; W.A. Kynard, Circuit Clerk of Dallas County; and the existing members of the Dallas County Commission: Erskine Minor, Curtis Williams, Perry Varner, Roy Moore, and Kimbrough Ballard, declaring that plaintiffs are entitled to the relief they seek, namely the termination of the 1988 injunction. Consequently, the defendants be and are hereby **ENJOINED** from conducting any future elections for the Dallas County Commission under the now vacated election scheme and are **ORDERED** to create and establish a new districting plan pursuant to which four members of the Dallas County Commission are to be elected from single-member districts and the Probate Judge shall resume his position as chairman *ex-officio* with the sole duty to preside over the Commission's meetings and cast a vote in the event of a tie as

**14.** *Cf., Presley v. Etowah County Commission,* 869 F.Supp. 1555, 1571 (M.D.Ala.1994) (rejecting the contention that a provision in the applicable consent decree requiring new commissioners elected pursuant to single-member district election divide powers equally for a limited period of time was violative of § 2 but recognizing that a modification of a consent decree might be warranted by "a significant change ... in law"), and its related case, *Presley v. Etowah County Commission,* 502 U.S. 491, 506, 112 S.Ct. 820, 830, 117 L.Ed.2d 51 (1992) (rejecting the United States' contention that States, "every time a state legislature acts to diminish or increase the power of local officials, preclearance would be required" and concluding that changes such as the Etowah County Commission's creation of a fund that stripped newly elected commissioners of certain powers relating to road maintenance funds, "affect only the distribution of power among officials [and] are not subject to § 5 because such changes have no direct relation to, or impact on, voting."). Again, the distinction between § 2 and § 5 of the Voting Rights Act is apparent.

**15.** In view of the illegality of this mandate to remove the Probate Judge and to create a fifth Commissioner for the Dallas County Commission, this challenged election scheme, namely the 1988 Lichtman Plan as amended in 1992 to comport with 1990 census data, cannot constitute a remedy, "narrowly tailored" or otherwise, for any perceived violation of § 2. To the extent that the Court concluded in *Rollins v. Dallas County Commission,* Civil Action No. 92–0242–CB–C, 1992 WL 611861 (S.D.Ala.1992), that the present five single-member districting plan "does the least violence to the state law while complying with the Voting Rights Act," it did not then have the benefit of *Holder* under the principles of which the plan is clearly illegal.

established by Act No. 328 of the Alabama Legislature of 1900–1901. Costs are taxed against the defendants.

Finally, it is **ORDERED** that the parties **CONFER** with each other and **SUBMIT** on or before **April 15, 1999,** jointly or severally, a written recommendation concerning an appropriate timetable for accomplishing the Court's orders which are to culminate in the election of the four Dallas County Commissioners who are elected from the four required single-member districts.

## ADDENDUM

In this addendum, the Court has extrapolated those agreed facts set forth by the parties in their jointly prepared Pretrial Order (Doc. 114), which governed this case. The facts enumerated in this addendum are relevant only to the extent they provide: (1) an historical perspective of the Eleventh Circuit's conclusion that the at-large election of the four Dallas County Commissioners from residency districts under Act No. 328 violated § 2 and that such violation must be remedied by requiring such Commissioners to be elected from single-member districts; and (2) support for the proposition that the circumstances on which this remedy with respect to the aforementioned four Commissioners was predicated have not changed sufficiently since 1988 to justify a withdrawal of that remedy. Plaintiffs do not challenge or seek elimination of the requirement that the four Commissioners authorized by Act No. 328 be elected from single-member districts. Plaintiffs challenge only the removal of the Probate Judge and the requirement that an additional fifth Commissioner be elected from a single-member district. The Court has omitted from this extrapolation, those matters designated as agreed facts by the parties which are either irrelevant to the present litigation or contain opinions not properly classified as findings of fact, whether or not agreed to by the parties.

1. Plaintiffs Dean Butch Wilson and Johnny Middlebrooks are adult resident citizens and registered voters of Dallas County. [Record citation omitted]. Plaintiff Wilson resides in District 2 of the current Dallas County Commission districting plan. Plaintiff Middlebrooks resides in District 4.

. 2. In 1996, Plaintiff Wilson was a candidate for election from District Two of the Dallas County Commission. Wilson ran as a Republican candidate. Wilson has been a member of the Dallas County Republican Executive Committee for the last two years. In 1972, Wilson was a candidate for election to the Selma City Council. Wilson has served as chief inspector for the Browns, Alabama voting place for approximately the last eight years. Wilson has worked in numerous campaigns over the years for candidates to the Dallas County Commission. Throughout his adult life, Wilson has maintained an interest in county government in Dallas County because it is important to him that county government functions efficiently and effectively to deliver to the citizens of Dallas County the services that they have come to rely upon and expect over the years.

3. [Omitted].

4. Defendants are John W. Jones, Jr. who is the probate judge of Dallas County, Harris Huffman, who is the Sheriff of Dallas County, and W.A. Kynard, who is the circuit clerk of Dallas County. Together, these persons compose the Board of Supervisors for Dallas County, which is responsible for the supervision of elections in Dallas County, including the certification of election results. [Statutory citation omitted] The members of the Dallas County Board of Supervisors implement districting plans approved by the other defendants. All of their actions which are material to this case were taken under color of state law.

5. Other defendants are the existing members of the Dallas County Commission: Erskine Minor, Curtis Williams, Perry Varner, Roy Moore, and Kimbrough

Ballard. Together, these persons have authority under state law, for a limited time after each decennial census, to redistrict the county commission. [Footnote omitted]. All of their actions which are material to this case were taken under color of state law.

6. The United States of America is also a defendant. It is a party to a previous injunction issued by this Court regarding the structure of the county's government. [Record citation omitted]. As a result of a lawsuit filed by the United States, at-large elections in Dallas County were enjoined for the County Commission and School Board.

7. Plaintiffs allege that the current system of government in Dallas County is contrary to Alabama law, and is created for predominantly racial reasons, partially in response to an order of this court. Specifically, in Count II, they contend that the Commission is composed of an additional elected official, and, in Count III, that the probate judge has been excluded from performing certain limited responsibilities to chair the Commission and vote in the event of a tie. To the extent that the Defendants purport to be implementing this Court's 1988 remedial order, Plaintiffs contend that such action is illegal in that the order exceeds the Court's power under the Voting Rights Act, and violates the Tenth Amendment. By amendment adding Counts IV and V to the Complaint, the Plaintiffs have alleged that the current system, in failing to follow state law, is created and utilized for predominantly racial reasons in violation of The Voting Rights Act and the Fourteenth Amendment. [Footnote omitted]. The U.S. denies the allegations.

8. [Omitted]

9. In 1988, this Court issued an injunction regarding the manner in which the Commission was to be elected, and since that time, five persons have been elected to the Commission from five single member districts. [Record citation omitted].

10. This Court's 1988 injunction was issued pursuant to findings that the "at-large election scheme utilized in election of members to the County Commission violates section 2 of the Voting Rights Act." *United States v. Dallas County Comm'n,* 850 F.2d at 1430, 1432 (11th Cir.1988) (describing holding of district court).

11. [Omitted].

12. Dallas County commissioners serve in a part-time capacity. The Dallas County Probate Judge serves in a full time capacity.

13. Plaintiffs also assert standing under the Tenth Amendment to claim injury from the unauthorized restructuring of county government. The U.S. denies these allegations.

14. Finally, Plaintiffs assert standing based upon the injury they suffer from the facial stereotypes embodied in the court order requiring the creation of a new subdistrict for an additional elected county official. The U.S. denies these allegations.

15. With the creation of an additional elected official, the Commission has incurred additional direct expenses. The direct additional expense arising, annually, from the creation of an additional elected official for the commission is $15,716.84 in salary, and FICA. [Record citation omitted].

16. In addition to this clear direct salary expense, the creation of an additional elected official may require additional salary expenses. The Commission makes available medical insurance to its members, but it appears that only three of the five commissioners are paid this benefit. Its cost ranges from $1,980 to $2,556. [Record citation omitted]. All commissioners also receive the benefit of payment of $205.44 in life insurance premiums. *Id.*

17. [Omitted].

18. In 1980, blacks were only 44.8 percent of the registered voters of Dallas county. [Citation omitted].

19. There are no white groups in Dallas County which slate candidates.

20. In the Lichtman Plan implemented by the Dallas County Commission in response to an order from the U.S. Court of Appeals for the Eleventh Circuit and an order from the District Court to conduct elections in December, 1988, the commission districts had the following percentages of total black population in the 1988 election, according to the 1980 census:

| | |
|---|---|
| District 1 | 72.4% |
| District 2 | 70.0% |
| District 3 | 61.3% |
| District 4 | 35.0% |
| District 5 | 36.0% |

21. A written description of the census enumeration districts, blocks and tracts included in each district of the Lichtman plan is attached [to the Pretrial Order] as Exhibit 1.

22. District 3 was intended to be a "swing" district in the 1988 election. A swing district is defined as a district within which "white voters and black voters have a relatively equal chance of electing candidates of their choice." [Citation omitted].

23. In 1992, the members of the Dallas County Commission redrew the lines for the single member districts from which members of the Commission are elected, in light of the 1990 census. [Record citation omitted].

24. Following the 1992 action of the Dallas County Commission in reconfiguration of the county commission districts, the districts had the following percentages of black voting age population in the 1992 election, according to the 1990 census:

| | |
|---|---|
| District 1 | 77.1% |
| District 2 | 61.0% |
| District 3 | 72.9% |
| District 4 | 28.1% |
| District 5 | 30.4% |

25. District 2 was intended to be a "swing" district in the 1992 elections, and the 1992 Resolution intended District 2 to replace District 3 as the "swing" district.

26. In early 1992, the Alabama legislature conferred authority on county commissions, which were subject to court orders requiring them to be elected from districts of die county, to redraw the boundary lines of the districts within a certain period of time following the census. See Act 92–01, Ala.Acts. This act became effective without the Governor's signature on February 3, 1992.

27. and 28. [Omitted].

29. On March 26, 1992, the Commission adopted a resolution which redrew the boundaries of the five Commission districts, and rescinding the previous adoption of the "Lichtman Plan." It put in place five single-member districts.

30. [Omitted].

31. The 1992 Commission plan provided for black voting age population in each of the five single member districts as follows:

| | |
|---|---|
| District 1 | 77.14% |
| District 2 | 61.02% |
| District 3 | 72.85% |
| District 4 | 28.14% |
| District 5 | 30.37% |

32. and 33. [Omitted].

34. Preclearance of the plan submitted by the Commission [to the U.S. Department of Justice] on March 26, 1992, was granted by letter dated May 12, 1992.

35. Jones has been the probate judge since 1976. He was chairman ex-officio through 1988.

36. through 39. [Omitted].

40. In 1986, after it was determined that the at-large structure of the Commission violated Section 2 of the Voting Rights Act, the Commission submitted to the Attorney General of the United States a proposed single member districting plan which provided for election of the probate judge as chairman ex-officio on an at-large basis, and which provided for election of the commissioners from single member districts of Dallas County.

41. Comments were received by the Attorney General, in 1986 in connection with review of the Commission's proposed plan, from interested citizens in Dallas County which criticized the feature of the plan which provided for election of the probate judge as chairman ex officio on an at-large basis.

42. Prior to issuance of the Eleventh Circuit opinion, in its brief to the Eleventh Circuit, the DOJ denied that it sought removal of all at-large seats on the Dallas County Commission. It suggested there and to this Court, that the probate judge could remain on the commission as ex-officio chairman, and even as tie-breaker, if an additional single-member district, which is drawn so as to ensure black and white voters an equal voting opportunity, is added to the Commission.

43. Reynolds prepared a four-district plan for Dallas County using the computer resources of the Legislative Reapportionment Office in Montgomery. In this plan, the black voting age populations according to the 1990 census for each of the districts is as follows:

| | |
|---|---|
| District 1 | 66.52% |
| District 2 | 48.01% |
| District 3 | 43.87% |
| District 4 | 54.21% |

44. through 47. [Omitted].

48. Dallas County, Alabama is located in south-central Alabama, 90 miles southwest of Birmingham and 50 miles west of Montgomery, and is bordered by Wilcox County to the south, Marengo County to the west, Perry and Chilton Counties to the north and west, Autauga County to the north and east, and Lowndes County to the east. [Citations omitted].

49. The total land area of Dallas County exceeds 624,000 acres or roughly 875 square miles. [Citation omitted].

50. and 51. [Omitted].

52. According to the 1990 Census, Dallas County, Alabama had a total population of 48,130 persons, of whom 20,054 (41.7 percent) were white and 27,825 (57.8 percent) were black.

53. According to the 1990 Census, Dallas County, Alabama had a total voting age population of 33,025 of whom 15,401 (46.6 percent) were white and 17,445 (52.8 percent) were black.

54. According to the 1980 Census, Dallas County had a population of 53,981 persons, of whom 24,099 persons (44.6 percent) were white persons and 29,488 (54.6 percent) were black persons.

55. According to the 1980 Census, the total voting age population of Dallas County was 35,469 persons, of whom 17,560 (49.5 percent) were white persons and 17,-407 (49.1 percent) were black persons.

56. through 61. [Omitted].

62. According to the 1990 Census, 57.3 percent of the total population of Dallas County was urban.

63. According to the 1990 Census, the socio-economic condition of black citizens of Dallas County is depressed as compared to the condition of white county residents: [Subparts omitted].

64. [Omitted].

65. According to the 1980 Census, the socio-economic status of black persons in Dallas County was depressed compared to that of white persons in Dallas County: [Subparts omitted].

66. through 76. [Omitted].

77. Immediately following passage of the Voting Rights Act in 1965, Dallas County was one of twelve Alabama counties to which the Attorney General of the United States appointed federal examiners because of the small proportion of black citizens who had succeeded in registering to vote. [Citation omitted].

78. through 81. [Omitted].

82. On February 8, 190 1, the Alabama Legislature enacted an at-large election system for the Dallas County Commission, pursuant to Acts of Alabama (1900–1901), No. 328 (February 8, 1901), p. 890. [Citation omitted]. All five county officials are elected at large, but each of the four commissioners were required to reside in, and run from one of four residency districts: Selma, North, South, and West. [Citation omitted]. At the time of the law's enactment on February 8, 1901, Dallas County was governed by a Probate Judge and four commissioners, all of whom were white

and all of whom had been appointed by the Governor in April 1900. [Record citation omitted].

83. Under the terms of Act No. 328 of 1901 the county's probate judge, or in his absence a commissioner elected by a majority of those present, was to preside over meetings of the county governing body. [Citations omitted].

84. through 93. [Omitted].

94. The effects of the adoption of at-large elections in 1901 were racially discriminatory. Although that plan was in effect for more than 80 years, no black person was ever elected at large to the Dallas County Commission under the election plan adopted in 1901. [Citation omitted].

95. In 1978, the United States challenged the at-large method of electing members to the Dallas County Commission and Board of Education as violative of Section 2 of the Voting Rights Act and the United States Constitution. [Citation omitted].

96. In 1988, the Eleventh Circuit ... ordered the Dallas County [Commission] to adopt a five-single member district method of electing its commissioners and a districting plan. *United States v. Dallas County Commission*, 850 F.2d 1430 (11th Cir.1988).

97. The following represents the demographic, district-by-district data for the 1988 court-ordered plan:

| District | Total Pop. | Total Black Pop. | Black % of the Pop. | Deviation |
|---|---|---|---|---|
| 1 | 10,455 | 7,571 | 72.4 | −3.2 |
| 2 | 10,481 | 7,334 | 70.0 | −2.9 |
| 3 | 11,101 | 6,800 | 61.3 | +2.8 |
| 4 | 11,480 | 4,013 | 35.0 | +6.3 |
| 5 | 10,464 | 3,770 | 36.0 | −3.1 |
| Total | 53,981 | 29,488 | 54.6 | |

98. Special primary, run-off, and general elections were held in November and December of 1988 to implement this new election method and districting plan. Black citizens were elected to the county commission for the first time since Reconstruction: three of the five county commissioners elected were black. At the same time that two black members were elected to the five-member Dallas County Board of Education, which also had been ordered by the Eleventh Circuit to adopt the same change to a five single-member district method of election and districting plans the county commission had adopted.

99. When this new method of election was implemented, all of the commission-related duties and responsibilities assigned to the probate judge by state or local law were assumed by the county commission. A chairperson was elected from the membership of the county commission and was assigned office space in the county courthouse.

100. In early March 1990, several individuals, contending that election for the office of county commission should be held in November of 1990, sought to qualify as candidates in the primary election. On March 19, 1990, the United States and the Dallas County Commission filed a joint motion for an "order confirming terms of office" of the commissioners elected in 1988. The Eleventh Circuit held that the commissioners elected in 1988 were entitled to four-year terms under Alabama Law and, therefore, would not be up for re-election until 1992. *United States v. Dallas County Commission*, 904 F.2d 26 (1990).

101. The 1990 Census data indicated that the court-ordered plan had become malapportioned. In response, the Dallas County Commission adopted a new redistricting plan at its March 26, 1992 meeting. This plan made only minor changes and maintained approximately the same racial population breakdown as the 1988 court-ordered plan had under 1990 Census figures. On May 12, 1992, the United States Attorney General precleared this plan under Section 5 of the Voting Rights Act, 42 U.S.C.1973c ("Section 5").

102. The release of the 1990 Census figures revealed that the 1988 court-ordered plan was unconstitutionally malapportioned and that the black proportion of the population had increased in two of the three black population majority districts and had decreased in one of those three districts, as follows:

| District | Total Pop. | Black % of Pop | Black % Voting Age Population | Deviation |
|---|---|---|---|---|
| 1 | 8,756 | 83.3 | 78.3 | −9.1 |
| 2 | 8,396 | 65.3 | 61.0 | −12.1 |
| 3 | 9,967 | 71.0 | 66.8 | +3.5 |
| 4 | 11,251 | 36.0 | 32.0 | +16.8 |
| 5 | 9,760 | 39.6 | 35.8 | +1.3 |
| Total | 48,130 | 57.8 | 52.8 | |

103. On March 27, 1992, Llewellyn R. Rollins, a white resident of Dallas County, filed suit challenging the county commission redistricting plan on state law and federal statutory and constitutional grounds. *Rollins v. Dallas County Commission*, C.A. No. 92–0242–CB–C (S.D.Ala.). The suit sought to enjoin the June 2, 1992 primary election for county commission and the use of the 1992 redistricting plan in that primary, in addition to seeking an order requiring the election of county commissioners under a new redistricting plan that would provide for a commission composed of the Judge of Probate, serving as chairperson, and four commissioners elected at-large. After a hearing,

the court found that the plaintiff was not entitled to the requested injunctive relief. In addition, the court found that the newly drawn district lines did not violate the Voting Rights Act or the Constitution and that the five single-member district plan was the proper form of government for Dallas County, on grounds that conditions had not changed sufficiently in Dallas County since *United States v. Dallas County Commission,* 850 F.2d 1430 (11th Cir.1988), to warrant the Court's intervention.

104. The black independent candidate, who had unsuccessfully run for county commission in District 2 in 1992, defeated the white incumbent in that district in the November 1996 general election. The Dallas County Commission presently consists of two white commissioners and three black commissioners. The present chairperson of the commission—elected from among the membership of the commission—is white.

105. through 118. [Omitted].

119. The existence of racially polarized voting in Dallas County elections for the period 1964 through 1978 was found by the [Eleventh Circuit] Court in *United States v. Dallas County Commission,* 739 F.2d 1529, 1536 (11th Cir.1984). [Proposed statistic omitted as incomplete and irrelevant].

120. This court found, on remand ["[i]n compliance with the Eleventh Circuit's mandate"], that, based on evidence from election contests between 1978 and 1986, voting patterns in Dallas County remained polarized along racial lines. *United States v. Dallas County Commission,* 636 F.Supp. 704, 710 (S.D.Ala.1986). The court also found that the degree of racially polarized voting in Dallas County was sufficient, when combined with the use of a majority vote requirement in the primary, and the use of designated posts, to warrant the conclusion that the at-large system for electing county commissioners in Dallas County violated Section 2 of the Voting Rights Act. *Id.*[16]

121. through 130. [Omitted].

131. The Eleventh Circuit ordered the Dallas County Commission to adopt and implement the five single-member districting plan proposed by the United States (during oral arguments before that court) for the election of county commissioners ("1988 court-ordered plan"), stating that the two "strong" majority white districts and two "strong" majority black districts and a fifth district in which "white voters and black voters have relatively equal chance of electing candidates of their choice" would provide all voters with equal access to the political process. [850 F.2d] at 1439, n. 6.

132. Defendant Dallas County moved for an *en banc* rehearing which was denied

---

**16.** This agreed fact is somewhat misleading. What this Court actually stated in the opinion relied on as the basis for this alleged "fact" was:

It is abundantly clear that, in this Circuit, great weight is attributed to the analysis of two of the factors enumerated above—polarized voting and the structure of the election system. *Dallas County,* supra, 739 F.2d at 1537. In compliance with the Eleventh Circuit's mandate, this Court has found that the combination of a majority requirement in the primary, the significance of the Democratic primary and the use of numbered posts operates to cancel voting strength of black minorities in Dallas County. This Court has also found that, based on the evidence presented during the

course of the post-remand evidentiary hearing relative to elections held since the entry of this Court's original judgment, that there is no substantial change in the voting patterns in Dallas County. In view of these findings and the appellate mandate, the Court concludes that the at-large election scheme utilized in the election of members for the Dallas County Commission violated Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973.[FN8]

FN8. The net effect of the conclusions here reached will one day rise up to haunt its advocates. This will require the further establishment of voting ghettos that in turn will serve to further isolate tile races as they seek to reach an accord of citizenship. What a pity we are so short-sighted.

on July 13, 1988. [Record citation omitted]. The [Eleventh] Circuit denied that petition and affirmed the determination that the court-drawn 4–1 method of election and districting plan violated Section 2. The [Eleventh Circuit] court then remanded the case to the district court for the sole purpose of directing the county commission to conduct special elections for its members under the five single-member district plan which they had approved. [Citation omitted]. The Supreme Court denied the county's petition for writ of certiorari.

133. through 137. [Omitted].

138. W.A. Kynard is the Circuit Clerk of Dallas County, Alabama.

139. through 154. [Omitted].